924 A.2d 38 (2007)
2007 VT 16
STATE of Vermont
v.
Brian E. BAUDER.
No. 04-438.
Supreme Court of Vermont.
March 16, 2007.
*40 Robert Simpson, Chittenden County State's Attorney, and Colin McNeil, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.
Matthew F. Valerio, Defender General, Henry Hinton, Appellate Defender, and Stephanie Pessin, Law Clerk (on the Brief), Montpelier, for Defendant-Appellant.
Present: REIBER, C.J., DOOLEY, JOHNSON and SKOGLUND, JJ., and ALLEN, C.J. (Ret.), Specially Assigned.
¶ 1. JOHNSON, J.
The question presented in this case is whether law-enforcement officers may routinely search a motor vehicle without a warrant, after its occupant has been arrested, handcuffed, and secured in the back seat of a police cruiser, absent a reasonable need to protect the officers' safety or preserve evidence of a crime. *41 We hold that such warrantless searches offend the core values underlying the right to be free from unreasonable searches and seizures embodied in Chapter I, Article 11 of the Vermont Constitution. Accordingly, the trial court judgment to the contrary is reversed.
¶ 2. During the early morning hours of September 23, 2003, South Burlington police officer David Solomon observed a vehicle on Shelburne Road that appeared to be traveling at a speed of forty-five to fifty miles per hour in a thirty-five mile-per-hour zone. The officer followed the vehicle, which weaved several times and continued to travel in excess of the speed limit. Based on these observations, the officer activated his blue lights. The vehicle, in response, pulled into the lot of a service station on Shelburne Road.
¶ 3. While speaking with the driver, later identified as defendant, the officer detected a faint odor of intoxicants and observed defendant's eyes to be watery and bloodshot. At the officer's request, defendant exited the vehicle and performed a number of field sobriety tests. Based on his further observations, the officer arrested defendant for driving under the influence (DUI), handcuffed him, and placed him in the rear of his police cruiser. A woman passenger in the vehicle was identified, released, and left the scene. Defendant produced an unsigned bill of sale that purported to vest title to the vehicle in himself, but a check of the vehicle registration failed to identify defendant as the vehicle's owner. A further records check disclosed that defendant's Texas driver's license was suspended.
¶ 4. After defendant was arrested and placed in the police cruiser, Officer Solomon and another officer who had arrived as backup searched defendant's car. Officer Solomon later testified that he routinely searches the vehicles of drivers arrested for DUI under the "incident-to-arrest" doctrine, confining his search to what he described as the "lungeable" area of the vehicle, i.e., the area that the driver or passengers could potentially reach. The officer acknowledged, however, that he did not feel in any danger from defendant, who was handcuffed and seated in the back of the police cruiser at the time of the search. Nor did the officer harbor any concern that evidence in the vehicle might be removed or destroyed.
¶ 5. In their initial search of the vehicle, the officers discovered the head of a parking meter behind the driver's seat, a pipe with burnt residue in an open compartment attached to the driver's door, and an empty beer can and a glass jar containing fragments of a green leafy substance under the driver's seat. The officers opened the jar and smelled the contents, confirming their suspicion that it had contained marijuana. Officer Solomon also detected a very faint odor of marijuana in the vehicle, although he acknowledged in his affidavit that the odor was not consistent with having been freshly smoked.
¶ 6. Having previously concluded that they would not permit the vehicle to be driven from the scene absent proof of ownership and insurance, the officers further determined  based on their initial search  to impound the car, tow it to the police station, and apply for a search warrant. A warrant was granted, and the subsequent search of a backpack on the back seat of the vehicle uncovered a clear plastic bag containing a white powdery substance, later determined to be 7.2 grams of the drug ecstasy.[1]
*42 ¶ 7. Defendant was charged with possession of marijuana, possession of ecstasy, and possession of stolen property. He moved to suppress all of the evidence on the ground that it had been discovered pursuant to an illegal search incident to arrest. In his memorandum in support of the motion, defendant urged rejection of the federal Fourth Amendment standard set forth in New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), which automatically permits the warrantless search of a motor vehicle following the arrest of its operator under the search-incident-to-arrest doctrine. Defendant argued for a more protective standard under Chapter I, Article 11 of the Vermont Constitution, to require a showing by the government that exigent circumstances justified the warrantless search to secure the officers' safety or preserve evidence of a crime.[2]
¶ 8. Following a hearing in which Officer Solomon testified to the circumstances of the stop and search, the court issued a written decision denying the motion to suppress. The court found that the warrantless search comported with both state and federal law as a search incident to arrest. Defendant later entered a conditional plea of guilty to one count of possession of ecstasy, and received a suspended sentence of two to five years and an order of restitution, all stayed pending the outcome of this appeal.
¶ 9. A motion to suppress evidence presents a mixed question of fact and law. While we uphold the trial court's factual findings absent clear error, we review the trial court's conclusions of law de novo. State v. Simoneau, 2003 VT 83, ¶ 14, 176 Vt. 15, 833 A.2d 1280.
¶ 10. As noted, this appeal presents a fundamental question concerning the extent to which Article 11 authorizes a search incident to arrest following a motorist's arrest for DUI. In addressing this issue, we do not write on a clean slate. While we have recognized that the Fourth Amendment and Article 11 both seek to protect our "`freedom from unreasonable government intrusions into . . . legitimate expectations of privacy,'" State v. Kirchoff, 156 Vt. 1, 6, 587 A.2d 988, 992 (1991) (quoting Oliver v. United States, 466 U.S. 170, 187, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (Marshall, J., dissenting)), we have also long held that our traditional Vermont values of privacy and individual freedom  embodied in Article 11  may require greater protection than that afforded by the federal Constitution. See State v. Rheaume, 2005 VT 106, ¶ 8 n. *, 179 Vt. 39, 889 A.2d 711 (recalling the extensive case law holding that Article 11 "affords individuals greater privacy rights than its federal counterpart in certain circumstances"). Recently, for example, we held that law-enforcement officers must have a *43 reasonable basis to believe that their safety is at risk or a crime requires investigation to order a driver stopped for a motor vehicle violation out of his or her vehicle. State v. Sprague, 2003 VT 20, ¶ 16, 175 Vt. 123, 824 A.2d 539. Although the United States Supreme Court has ruled  to the contrary  that the Fourth Amendment permits routine exit orders in such circumstances, Pennsylvania v. Mimms, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), we concluded in Sprague that "a rule requiring a minimal level of objective justification . . . strikes the proper balance . . . between the need to ensure the officer's safety and the constitutional imperative of requiring individualized, accountable decisionmaking for every governmental intrusion upon personal liberties." Sprague, 2003 VT 20, ¶ 16, 175 Vt. 123, 824 A.2d 539.
¶ 11. Sprague is especially instructive for our purposes here because it illustrates the principles that this Court applies in weighing the competing interests of individual freedom and effective law enforcement that invariably underlie Article 11 cases. In Mimms the Supreme Court embraced a "bright-line" rule for officers to follow by allowing them to order drivers out of their vehicles without any particularized suspicion or safety concern. In Sprague, however, we rejected administrative simplicity as an adequate basis for a seizure when weighed against the individual's right to be free from arbitrary police intrusions. "[D]ispensing entirely with the requirement that an officer provide some reasoned explanation for an exit order," we observed, "invites arbitrary, if not discriminatory, enforcement." Id. ¶ 19. Hence, we required an individualized showing of some "objective circumstance" that would cause a reasonable officer to believe the order was necessary to protect the officer's safety or to investigate a suspected crime. Id. ¶ 20.
¶ 12. Although the specific holding in Sprague was new, its basic reasoning was consistent with many of our earlier decisions. A similar balance was struck, for example, in Kirchoff, where we rejected a Supreme Court ruling that privacy in land may not extend beyond the immediate area surrounding the home, observing that "[t]his per se approach cannot be squared with Article 11." 156 Vt. at 8, 587 A.2d at 993. State v. Savva similarly stands for the principled rejection of "bright-line" rules or administrative efficiency as adequate grounds for dispensing with the constitutionally based warrant requirement. 159 Vt. 75, 616 A.2d 774 (1991). Confronted, as in Kirchoff, with several longstanding Supreme Court precedents  in this case granting police authority to automatically search closed containers within a vehicle  we nevertheless rejected the high court's "bright-line tests . . . because these tests fail to do justice to the values underlying Article 11." Savva, 159 Vt. at 87, 616 A.2d at 781 (quotation omitted).
¶ 13. The values illustrated by these and many other decisions of this Court rest  at their core  on the fundamental principle of limited government. Article 11's warrant requirement represents one of the essential checks on unrestrained government determined by the framers  and confirmed through hard experience  to be necessary to the preservation of individual freedom. The warrant requirement serves as a check on the executive power by guaranteeing review by a neutral and detached magistrate before a search is carried out, thereby deterring "searches on doubtful grounds" and assuring the people of "an impartial objective assessment" prior to a governmental invasion. Id. at 86-87, 616 A.2d at 780; see also State v. Geraw, 173 Vt. 350, 352, 795 A.2d 1219, 1221 (2002) (observing that the *44 warrant requirement "reflects a deeply-rooted historical judgment that the decision to invade . . . privacy . . . should normally be made by a neutral magistrate, not by the agent of the search itself").[3]
¶ 14. Searches outside the normal judicial process are, therefore, presumptively unconstitutional, and permissible only pursuant to a few narrowly drawn and well-delineated exceptions. Savva, 159 Vt. at 86, 616 A.2d at 780; State v. Meunier, 137 Vt. 586, 588, 409 A.2d 583, 584 (1979). Such rare exceptions are allowed "only in those extraordinary circumstances which make the warrant and probable-cause requirement impracticable." State v. Petruccelli, 170 Vt. 51, 62, 743 A.2d 1062, 1070 (1999) (quotation omitted). As we explained in Petruccelli, "[e]xceptions to the warrant requirement `must be factually and narrowly tied to exigent circumstances and reasonable expectations of privacy.'" Id. (quoting Savva, 159 Vt. at 87, 616 A.2d at 781).[4]
¶ 15. One such exception is the search-incident-to-arrest doctrine. Although its scope has varied over time, the essential elements of the doctrine were settled by the United States Supreme Court in the landmark case of Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Reconciling years of debate, the high court held that, when a suspect has been lawfully arrested, the police may conduct a warrantless search of the person arrested for "any weapons that the latter might seek to use" to resist arrest or facilitate an escape, and "any evidence on the arrestee's person in order to prevent its concealment or destruction." Id. at 763, 89 S.Ct. 2034. In a famous subsequent passage, the Court observed further that "the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule." Id.
¶ 16. This so-called "grab rule" defined and limited the doctrine for more than a decade, and was routinely applied in every state including Vermont. See, e.g., Meunier, 137 Vt. at 588, 409 A.2d at 584 (citing Chimel for the principle that a search incident to arrest must be "reasonable in time and scope"); State v. Mayer, 129 Vt. 564, 567, 283 A.2d 863, 865 (1971) (citing Chimel to uphold a warrantless "protective search" of defendant for weapons at the time of his arrest); see generally 3 W. LaFave, Search and Seizure § 7.1, at 502-14 (4th ed. 2004) (reviewing history and development of search-incident-to-arrest doctrine). In Belton, 453 U.S. at 460, 101 S.Ct. 2860, however, the Supreme Court revisited the doctrine in the context of a motor-vehicle search, explaining that police officers remained uncertain after Chimel about the precise scope of their authority and required a more "workable *45 rule." To provide such a bright-line rule, the Court held that when police officers have arrested the occupant of a vehicle, they may routinely search its passenger compartment and the contents of any containers found therein as a "contemporaneous incident of that arrest." Id. at 460-61, 101 S.Ct. 2860. More recently, in Thornton v. United States, 541 U.S. 615, 623-24, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004), the Supreme Court reaffirmed the rule announced in Belton, holding that it applied even where the driver had been arrested, handcuffed, and secured in the back seat of a police cruiser.
¶ 17. Belton was the subject of sharp criticism when it was decided, and it has remained controversial ever since. Justice Brennan, writing in dissent, observed that the rule was "analytically unsound and inconsistent with every significant search-incident-to-arrest case" with similar facts in the Court's recent history. 453 U.S. at 468, 101 S.Ct. 2860. The Court had always required that exceptions to the warrant clause be firmly grounded in, and narrowly tailored to, the extraordinary circumstances justifying the exception. Plainly, however, an arrestee who has been secured away from the vehicle is in no position to seize a weapon or evidence from its interior. See id. at 465-66, 101 S.Ct. 2860 (Brennan, J., dissenting) ("When the arrest has been consummated and the arrestee safely taken into custody, the justifications underlying Chimel's limited exception to the warrant requirement cease to apply: at that point there is no possibility that the arrestee could reach weapons or contraband."). Nor, as Justice Brennan observed, had the Court ever held that mere administrative simplicity was a sufficient basis for a warrant exception. See id. at 469, 101 S.Ct. 2860 ("[T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment." (quotation omitted)). Furthermore, as Justice Brennan noted, the need for so-called "bright lines" was simply unsupported; the search-incident-to-arrest doctrine under Chimel placed no greater demands on law enforcement officers than other Fourth Amendment rules requiring the exercise of considered police judgment in light of the facts and circumstances, as when deciding whether reasonable suspicion justifies an investigatory stop and frisk, or whether probable cause supports a warrantless arrest. Id. at 471, 101 S.Ct. 2860 ("The standard announced in Chimel is not nearly as difficult to apply as the Court suggests."). Indeed, Justice Brennan observed, the bright-line rule forged by the Belton majority was not even likely to eliminate the continued need for the exercise of police judgment in determining, for example, the exact nature of a "contemporaneous" search incident to arrest. Id. at 470, 101 S.Ct. 2860 ("Would a warrantless search incident to arrest be valid if conducted five minutes after the suspect left his car? Thirty minutes? Three hours?").
¶ 18. The concerns identified in the Belton dissent have continued to gather support from courts and commentators alike. Professor LaFave and others have questioned the warrantless search rationale based on either safety or simplicity, particularly as studies have shown that the police almost invariably handcuff and remove arrested drivers from the area of the vehicle. See 3 LaFave, supra, § 7.1(c), at 525; see also M. Moskowitz, A Rule in Search of a Reason: An Empirical Reexamination of Chimel and Belton, 2002 Wis. L.Rev. 657, 697 (suggesting that auto searches following arrest should require a showing of "particular and unusual facts" that hinder the police from their usual procedure of "restraining and removing the suspect from any area that might contain *46 a weapon or evidence"); A. Alschuler, Bright Line Fever and the Fourth Amendment, 45 U. Pitt. L.Rev. 227, 274 (1984) ("If any bright line rule had been necessary to resolve issue in Belton, it would have been the opposite of the rule that the Court announced."); E. Shapiro, New York v. Belton and State Constitutional Doctrine, 105 W. Va. L.Rev. 131, 137 (2002) (noting that "[c]riticism of Belton has been vigorous and sustained," based principally on the lack of support for the Court's rationale that "existing law had proven to be so unworkable that it was necessary to forego Chimel's approach in favor of a bright-line rule").
¶ 19. In addition, while a majority of states continue to apply the rule in Belton, a number have either rejected or modified it under their state constitutions. See Shapiro, supra, 105 W. Va. L.Rev. at 141-42 (listing and discussing the state decisions that have declined to follow Belton or have applied a modified federal approach). New Jersey, Pennsylvania, New Mexico, and Nevada have all unequivocally rejected Belton under their state constitutions, applying instead the familiar standard predicated upon a showing of necessity to secure the officer's safety or preserve evidence. See Camacho v. State, 119 Nev. 395, 75 P.3d 370, 373-74 (2003) (rejecting Belton and concluding that "under the Nevada Constitution, there must exist both probable cause and exigent circumstances for police to conduct a warrantless search of an automobile incident to a lawful custodial arrest"); State v. Eckel, 185 N.J. 523, 888 A.2d 1266, 1276-77 (2006) (declining to adopt Belton and holding that under the New Jersey Constitution the search-incident-to-arrest doctrine applies only "to ensure police safety or to avoid the destruction of evidence"); State v. Pittman, 139 N.M. 29, 127 P.3d 1116, ¶ 16 (Ct.App.2005) ("Because of New Mexico's strong preference for a warrant, we hold that even after a valid arrest, one of Chimel's two rationales must be present before an officer may search a vehicle without a warrant.") cert. granted, 139 N.M. 273, 131 P.3d 660 (2006); Commonwealth v. White, 543 Pa. 45, 669 A.2d 896, 902 (1995) (invalidating warrantless vehicle search where the arrestee was a secure distance from his vehicle, and holding that under the Pennsylvania Constitution the police may search only "the arrestee's person and the area in which the person is detained in order to prevent the arrestee from obtaining weapons or destroying evidence").
¶ 20. In our judgment, these decisions more closely reflect the principles and values underlying Article 11 as expressed in numerous opinions of this Court than the "abrupt shift in the standard of fourth amendment protections" represented by the Belton decision. C. Hancock, State Court Activism and Searches Incident to Arrest, 68 Va. L.Rev. 1085, 1085 (1982). As earlier explained, we have consistently rejected bright-line rules  however laudable their purpose in easing the burden on law-enforcement officers  as an adequate basis for relaxing the fundamental limitation on governmental power represented by the warrant requirement. Indeed, we have scrupulously maintained the principle  even, as here, in the face of contrary United States Supreme Court holdings  that any exception to the warrant requirement must be factually and narrowly tied to the exigencies that rendered a warrant application impracticable under the circumstances. Absent such circumstances, Article 11 simply forbids a warrantless search. As the New Jersey Supreme Court explained in admirably clear and unambiguous terms in Eckel, a warrantless automobile search based "solely on the arrest of a person unable to endanger the police or destroy evidence cannot be justified under any exception to *47 the warrant requirement and is unreasonable." 888 A.2d at 1277.
¶ 21. The State here offers no serious argument that the warrantless search in this case was justified as a search incident to arrest on any basis other than the blanket authority of Belton. Although our dissenting colleague claims that the search was somehow necessary to protect the officer's safety or preserve evidence, no persuasive evidence or argument is offered to demonstrate how defendant  handcuffed in the back seat of the police cruiser  or his passenger who had left the scene, presented any form of threat. The dissent's further assertion that the search here was actually consistent with pre-Belton decisional law is equally unsound. One need only read the impassioned Belton dissent to understand how fundamentally at odds that decision was with prior law. Contrary to the dissent's additional claim, moreover, it is clear that under Chimel and its progeny a showing of exigent circumstances in the form of a threat either to officer safety or to the preservation of evidence is essential to justify a warrantless vehicle search.
¶ 22. Having rejected Belton in favor of the traditional rule requiring that officers demonstrate a need to secure their own safety or preserve evidence of a crime, and finding no evidence of either need in this case, we are compelled to conclude that the trial court order denying defendant's motion to suppress must be reversed.
¶ 23. Although, in our view, the reasons that compel rejection of Belton apply with equal and obvious force to the so-called "Belton variation" adopted by several states, and although the State has not argued otherwise, we defer closing this portion of the discussion to consider this alternative in light of the dissent's strong endorsement of it. As the dissent notes, several states have allowed the police to conduct warrantless searches of automobiles after the occupant has been arrested in order to obtain evidence related to the crime that formed the basis of the arrest. As the dissent observes, the rationale of these decisions appears to be that "the arrest itself provides the probable cause basis for the search." Post, ¶ 90. The dissent would adopt this approach so long as the search was for "evidence related to the crime" and limited to the passenger compartment of the vehicle. Post, ¶ 90.[5]
¶ 24. The so-called Belton variation endorsed by the dissent is just that, a variation of Belton. Although the rationale is different  the arrest purportedly provides the probable cause to search  the reasoning remains essentially the same, based on a perceived need to authorize routine warrantless searches absent any particularized showing that the delay attendant upon obtaining a warrant is impracticable under the circumstances. As earlier observed, however, such an approach is fundamentally at odds with Article 11, under which warrantless searches are presumptively unconstitutional absent a showing of specific, exigent circumstances justifying circumvention of the normal judicial process. As we explained in State v. Trudeau, "no amount of probable cause can justify a warrantless search or seizure absent exigent circumstances." 165 Vt. 355, 360, 683 A.2d 725, 729 (1996) *48 (quoting Horton v. California, 496 U.S. 128, 137 n. 7, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) (quotation omitted)). Surely this principle applies with equal or greater force where the probable cause is merely presumed from the fact of an arrest.
¶ 25. Inherent, too, in the Belton variation are a number of assumptions that simply do not withstand scrutiny. First, as earlier discussed, support for the assumption that case-by-case evaluations are unworkable in the context of warrantless vehicle searches is simply lacking. Second, the assumption that an arrest automatically provides probable cause for a search is highly questionable. The finding of probable cause is a decidedly fact-specific determination, turning on whether the particular circumstances establish a "nexus between the crime, the suspect, and the place to be searched." State v. Towne, 158 Vt. 607, 616, 615 A.2d 484, 489 (1992). A driver arrested for DUI may have been drinking at home, at a friend's, in a restaurant or bar, or at a sporting event, but not necessarily in his or her car. While the facts  e.g., the strong odor of intoxicants coming from inside the vehicle or an actual admission by the suspect  might indicate the presence of alcohol in the vehicle, the arrest itself does not invariably establish the requisite nexus to search. Nothing about the fact that the search occurs in a vehicle, moreover, would justify a reduced probable-cause standard. Indeed, while we have acknowledged that vehicles support a somewhat diminished expectation of privacy, this is not to say  and we have never held  that they carry no expectation of privacy, or that an arrest of the driver obviates the need to establish specific probable cause to search.
¶ 26. The dissent's additional assumption of administrative simplicity is equally questionable. The dissent would permit searches only for evidence "related to the crime" for which the suspect was arrested. Post, ¶ 90. Would this permit a vehicle search following an arrest of the driver on an outstanding warrant for failure to appear? What if the underlying charges on the outstanding warrant related to possession of cocaine? Would an arrest for assaulting an officer during a routine vehicle stop authorize a search, and if so, for what? Does the nature of the arrest define the scope of the search, i.e., would an arrest based on possession of stolen televisions authorize a search under the car seat? The so-called bright-line rule advocated by the dissent raises as many questions as it answers. It most assuredly does not, however, commend itself as superior to the traditional search-incident-to-arrest rule in any respect.
¶ 27. Finally, in view of the dissent's strenuous claims to the contrary, we take the opportunity to explain the necessity of today's holding. Our dissenting colleague proffers essentially three separate doctrinal exceptions to the warrant requirement as more suitable "independent grounds" of decision. Post, ¶ 40. It is, of course, a fundamental tenet of judicial restraint that courts will not address constitutional claims  least of all novel or unresolved constitutional claims  when adequate lesser grounds are available. See In re Sealed Documents, 172 Vt. 152, 156, 772 A.2d 518, 523 (2001) (noting "[o]ur tradition of addressing issues of constitutional significance only when the matter is squarely and necessarily presented").
¶ 28. First, it is asserted that the parking-meter head discovered behind the driver's seat was "in plain view" and therefore  as patent contraband  provided an independent basis to search the car under the well-settled plain-view exception to the warrant requirement. Post, ¶¶ 42-51. The claim is predicated upon the investigating officer's statement, in response to a *49 question from the trial court, that the parking meter was visible from outside the vehicle. As noted, however, the search here did not proceed from a plain-view observation of the parking meter. Indeed, the officer repeatedly acknowledged that he did not see the parking meter during his initial contact with defendant outside the vehicle; he became aware of its existence only during the more probing search inside the car. The trial court addressed this seeming anomaly by finding unequivocally that the officer discovered the parking meter during the search incident to arrest, while noting that it "was arguably exposed to plain view."[6]
¶ 29. Thus, the facts underlying the dissent's proposed plain-view analysis may be characterized, at best, as uncertain. The legal basis, however, can only be described as dubious. The dissent relies on a single statement in Trudeau, 165 Vt. at 358, 683 A.2d at 727, quoting Horton v. California, 496 U.S. at 136, 110 S.Ct. 2301, to the effect that an "essential predicate" underlying the plain-view doctrine is that "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." (Emphasis added.) Nothing in either decision, however, remotely suggests that the underscored language was intended by this Court or the United States Supreme Court to establish a constructive plain-view standard, to be satisfied whenever an officer asserts in hindsight that the evidence could have been plainly viewed, although in fact it was not. On the contrary, in both cases, as indeed in virtually every case dealing with the doctrine that we have uncovered, the plain-view exception was based on the officer's actual observation of the evidence in question.
¶ 30. This is hardly surprising, as it is the police officer's perception of the object which establishes, in each case, its "plain-view" status. As the high court explained in Texas v. Brown, the plain-view doctrine is predicated on two principles: first, "that when a police officer has observed an object in plain view" from a legal vantage point the owner's privacy interests are forfeited; and second, that requiring a warrant once the police "have obtained a first-hand perception of [the object] would be a needless inconvenience." 460 U.S. 730, 739, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (emphasis added, quotation omitted). Thus, as the Court observed, "our decisions have come to reflect the rule that if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately." Id. (emphasis added). This basic rule has been applied in every case to come before the Court, including those where the objects in question were observed through aerial surveillance, or with the aid of illumination. See, e.g., Florida v. Riley, 488 U.S. 445, 448-49, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (search upheld where police in helicopter were able to observe with the "naked eye" marijuana growing in greenhouse); California v. Ciraolo, 476 U.S. 207, 213-15, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (police observed marijuana visible to "naked eye" from aircraft); Brown, 460 U.S. at 739, 103 S.Ct. 1535 (use of flashlight to enhance visibility did not invalidate seizure of drugs observed by officers). To modify the doctrine by allowing the seizure of objects *50 which the officers did not observe  as advocated by the dissent  would eviscerate its fundamental evidentiary and legal grounding.
¶ 31. In essence, therefore, the dissent proposes that we forgo addressing an issue  the scope of the search-incident-to-arrest doctrine in the context of a vehicle search  that the police officers here expressly relied on, that the parties briefed and argued at trial and on appeal, that formed the core of the trial court's decision, and that  as explained earlier  has been the subject of extensive discussion and debate among courts and commentators. Instead, the dissent urges that we address a novel constitutional issue based on questionable facts and even less legal support. With respect, we fail to see how this proposed alternative makes any sense, or serves any sound jurisprudential purpose.
¶ 32. The dissent also claims that defendant's failure to provide a valid driver's license, registration, or insurance card, coupled with irregularities in the vehicle's plates and bill of sale, authorized the police to conduct a warrantless search for proof of ownership. The argument is unpersuasive. It relies, essentially, on the so-called "automobile exception" to the warrant requirement, which  as we have elsewhere explained  requires a showing of both probable cause that the vehicle contains evidence of a crime, and exigent circumstances suggesting that the evidence may be lost during the delay attendant upon obtaining a warrant. See Savva, 159 Vt. at 89-90, 616 A.2d at 782 (holding that warrantless search of bags found within car "was not supported by exigent circumstances because a less intrusive option was available" and therefore must be invalidated); State v. Girouard, 135 Vt. 123, 129, 373 A.2d 836, 840 (1977) (describing the "well-delineated preconditions" to the automobile exception as "1) probable cause to believe that the vehicle contains evidence of crime and 2) exigent circumstances").
¶ 33. Neither requirement was satisfied here. Despite the officer's suspicion that the car might have been stolen, he did not arrest defendant on that basis and identified no ground, much less probable cause, to believe that proof of ownership might be discovered behind or underneath the driver's seat, where the parking meter and glass jar containing marijuana were found. Even if it were assumed, however  as the dissent urges  that the inadequate proof of ownership established probable cause to believe that the car was stolen, the circumstances did not establish that element of urgency essential to the execution of a warrantless search. The officer readily acknowledged that he had no concerns about the possibility of evidence inside the vehicle being removed or destroyed. Indeed, prior to the search, the officers had not observed any evidence of a crime in the vehicle, let alone evidence that might conceivably be lost or destroyed.[7]
¶ 34. Furthermore, defendant was under arrest, the car was not on a public highway but safely parked in a commercial lot, and the police had determined that it would be grounded, i.e., locked and kept there until they determined its ownership. Hence, there was no exigency compelling an immediate search rather than a subsequent warrant application. In Trudeau, the principal case on which the dissent relies, the police had observed evidence in *51 plain view within the vehicle that related directly to the offense for which defendant was arrested. Indeed, we analyzed Trudeau as a plain-view case, not an automobile-exception case, emphasizing that the officers violated no privacy rights of the defendant when they observed an open beer can in plain view on the floor of the defendant's car before arresting him for DUI. 165 Vt. at 358, 683 A.2d at 727-28. Here, in contrast, the officers had no indication that defendant's vehicle contained any contraband or evidence of a crime. Furthermore, the record in Trudeau revealed the presence of two additional passengers in the vehicle who also appeared to be intoxicated and who had remained near the vehicle during the police encounter, although they had not been arrested. This was sufficient to suggest that they might have had not only the opportunity, but the incentive, to seek access to the vehicle to remove the evidence the police had observed therein, and thus established the exigency necessary to forgo a warrant. Trudeau, 165 Vt. at 357, 361, 683 A.2d at 726, 729. Neither circumstance was present here. The police had not observed any evidence of a crime in the vehicle, and there was nothing to indicate that the passenger, who had been questioned by the police and had departed, would have any reason to return to the vehicle or ability to remove its contents. Accordingly, we are not persuaded that the automobile exception provides a viable basis to uphold the trial court decision.[8]
¶ 35. Finally, the dissent proposes in a footnote that the search here could be validated as an inventory search under the inevitable-discovery doctrine. Courts have approved inventory searches of lawfully impounded vehicles to protect the owner's property while in police custody, see, e.g., Colorado v. Bertine, 479 U.S. 367, 372-73, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987), and have upheld the admission of evidence that the police would have "inevitably discovered" during such a search. United States v. Seals, 987 F.2d 1102, 1107-08 (5th Cir.1993). The doctrine has no application here because, prior to the illegal search, the officer testified that they had determined only to "ground" the vehicle, i.e., to leave it in place in the private lot where it was parked. The decision to impound the vehicle was not made until after the warrantless search, and was based on the evidence obtained during that illegal search. Accordingly, there was no legal basis to impound the vehicle, and hence no grounds for applying the inevitable-discovery doctrine.
¶ 36. In closing, we believe that it is essential to be as clear about what this *52 case concerns as what it does not. Although the dissent repeatedly and emphatically asserts that our holding somehow removes important safety protections for law-enforcement officers, it cites not one shred of evidence in the record nor a single statistic, relevant public-safety study, or other empirical evidence outside the record to support the claim. Indeed, as we have explained, the evidence and authorities demonstrate that, far from removing safety protections, our holding is entirely consistent with existing, standard police procedures and removes no essential safeguards. We yield to no one on this Court in our commitment to the safety of Vermont law-enforcement officers in the field. Strident assertions, however, are no substitute for proof. In the absence of a demonstrated need, we are not at liberty to disregard the fundamental constitutional requirement of a search warrant. By limiting the exercise of arbitrary governmental power, this constitutional safeguard protects the police no less than the public.[9]
¶ 37. Justice Robert Jackson once observed that "[w]hen the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). Any other rule, he explained, "would reduce the [right] to a nullity" and leave us secure in our homes and persons "only in the discretion of [law-enforcement] officers." Id. Where, as here, the sole justification for dispensing with the fundamental safeguard of personal liberty represented by the warrant requirement is law-enforcement efficiency, we have consistently ruled in favor of liberty. As our own Justice Larrow once observed, "[t]his seems a slight price to pay for the fundamental rights preserved by" the Constitution. State v. Connolly, 133 Vt. 565, 571, 350 A.2d 364, 368 (1975).
Reversed.
¶ 38. DOOLEY, J., dissenting.
This has turned into one of the most important decisions from this Court, in large part because the majority has decided to render a broad and unnecessary constitutional ruling. The circumstances presented in this case are, with variations, played out every day many times throughout the state as law-enforcement officers interact with drivers who are dangerous to *53 others and may be dangerous to the officers. Indeed, stopping and approaching a vehicle, particularly as here in the middle of the night, is one of the most dangerous activities in which police officers engage. In these circumstances, the officers must act quickly and decisively and cannot become constitutional law scholars to determine what actions are appropriate, particularly to protect their own safety. Such circumstances led a broad range of commentators to urge the adoption of a bright-line standard to determine the perimeters of lawful searches following automobile stops  a bright line that can be easily applied by the officer and understood by the citizen. In New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), the United States Supreme Court responded with a bright-line test. Belton in turn has led to a large number of state constitutional law decisions confronting the issues of whether a bright-line test is appropriate and, if so, where the bright line should be drawn. As a result, there are many thoughtful alternatives from which to choose.
¶ 39. In my judgment, the Court's decision removes an important safety protection for officers, while offering little additional privacy to motorists whose vehicles and vehicle interiors are already on display to the public. Thus, the decision makes the job of an officer who stops a vehicle at two o'clock in the morning, as this officer did, more dangerous. To a large extent, the decision will preclude searches of vehicles made pursuant to the arrest of the driver or occupant, leaving weapons, contraband and evidence for which the occupant was arrested inaccessible to the officer. In general, the majority reaches this result by arguing that the only law-enforcement interest involved is administrative efficiency, which must give way to the legitimate privacy interests of citizens. In my opinion, this analysis trivializes the very important safety and evidence-gathering interests that are at stake in this decision, while exaggerating the privacy interests. I cannot subscribe to this result, especially where the gain in legitimate privacy protection is so limited.
¶ 40. Before addressing the perimeters of the search-incident-to-arrest exception under Article 11 of the Vermont Constitution, I emphasize that the majority's broad constitutional holding is wholly unnecessary because the search of defendant's vehicle in this case is fully justified under principles this Court has already adopted. There are two independent grounds under which we should affirm the trial court's denial of defendant's motion to suppress, and the search is also justified by pre-Belton jurisprudence from this state and others. First, undisputed testimony and the court's findings demonstrate that the stolen parking meter found in the vehicle defendant was operating was in plain view at the time the police lawfully stopped and approached the vehicle, and thus the seizure of the parking meter and other evidence plainly visible in the open passenger compartment of the vehicle was justified under the plain-view exception to the warrant requirement. Second, defendant's failure to produce a valid driver's license, a vehicle registration card, or any proof of insurance, coupled with irregularities concerning the vehicle's plates and bill of sale, created a reasonable suspicion that the car had been stolen and authorized the police to conduct a limited warrantless search of the vehicle to look for proof of ownership. Third, the search is justifiable even under the search-and-seizure law existing prior to the Belton bright-line rule.
¶ 41. The majority passes over the first ground and ignores the second ground in part because it views the facts most favorably to defendant and ignores the trial court's findings, contrary to our standard *54 of review. See State v. Simoneau, 2003 VT 83, ¶ 14, 176 Vt. 15, 833 A.2d 1280 (stating that motion to suppress involves mixed question of fact and law, and that reviewing court must accept trial court's findings unless they are clearly erroneous). The relevant facts are as follows. At two o'clock in the morning, the arresting officer observed defendant traveling at an excessive speed and driving erratically. After pulling the vehicle over, the officer noted that defendant had bloodshot eyes and smelled of alcohol. Defendant was unable to produce a valid driver's license, car registration, or proof of insurance, and the bill of sale he produced did not have a buyer's name on it. Moreover, a computer search revealed that defendant's Texas driver's license had been suspended, that defendant had a multi-state arrest record, and that the license plates on the vehicle had been assigned to a different car. When defendant failed to satisfactorily perform dexterity tests administered by the officer, he was arrested for DUI, handcuffed, and placed inside the police cruiser. The passenger in the car was then allowed to leave the scene, and the officer conducted a limited search of the vehicle, which revealed a stolen parking meter, an empty beer can, and drugs. A sample of defendant's breath provided at the police station revealed a blood-alcohol content of .162, more than double the legal limit.
¶ 42. With these facts in mind, I first examine the plain-view exception to the warrant requirement. For that exception to apply, (1) the officer must have lawfully been in a "`place from which the evidence could be plainly viewed'"; (2) the item must be plainly visible and its incriminating nature must be immediately apparent; and (3) "`not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself.'" State v. Trudeau, 165 Vt. 355, 358, 683 A.2d 725, 727 (1996) (quoting Horton v. California, 496 U.S. 128, 136-37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)) (emphasis added).
¶ 43. Here, notwithstanding the majority's suggestion to the contrary, the evidence was undisputed that the stolen parking meter was in plain view from outside the vehicle defendant was operating at the time of the stop. The officer at the scene testified unequivocally on direct examination that a parking meter was laying uncovered on the floor of the vehicle behind the driver's seat in plain view from outside the vehicle. In response to a direct question from the court, the officer again testified that "the parking meter head was visible from outside the vehicle." During cross-examination of the officer, defense counsel questioned whether the parking meter head was actually visible from outside the car, given that the officer had acknowledged not noticing it until he opened the car door to search the vehicle. The officer reiterated that the parking meter head was uncovered and plainly visible from outside the car. In the end, defendant did not attempt to dispute that fact. The district court stated in its decision that the seized parking meter was "arguably" exposed to plain view, and, in response to defendant's motion for reconsideration, the court elaborated that "the stolen parking meter was readily visible through the car windows given its size and nature." Thus, the majority incorrectly states that the record is at best "uncertain" with respect to whether the parking meter was in plain view.
¶ 44. Nor was there any dispute that the officer had made a lawful stop and was lawfully positioned outside the vehicle in a location from which the parking meter was visible. Further, the incriminating nature of the disconnected parking meter was manifest.
*55 ¶ 45. Hence, two issues remain concerning the applicability of the plain-view exception in this case. The first is whether the officer had to have actually seen the parking meter while he was in a lawful position, or whether it was sufficient that the parking meter was in plain view from where the officer was legally positioned moments earlier, even though he did not actually notice the parking meter until he commenced the challenged search by opening the car door. In my view, it is immaterial that the officer did not happen to notice the plainly visible parking meter before he began searching the car. The test, as quoted above, is whether the item "`could be'" plainly viewed from a lawful location. Trudeau, 165 Vt. at 358, 683 A.2d at 727 (quoting Horton, 496 U.S. at 136, 110 S.Ct. 2301). This objective test is consistent with the general rule that search-and-seizure analysis is not subjective, and that an inquiry into the reasonableness of particular police conduct is a purely objective one. See United States v. Messino, 871 F.Supp. 1035, 1039 (N.D.Ill. 1995) ("[T]he Supreme Court's rejection of the inadvertency requirement for a plain view seizure in Horton v. California can be read as a rejection of subjective inquiry as an element of plain view analysis in general."); see Horton, 496 U.S. at 138, 110 S.Ct. 2301 ("[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer.").
¶ 46. An objective test is also consistent with the theoretical underpinning of the plain-view exception  that there can be no reasonable expectation of privacy in items left in plain view of officers lawfully positioned to see them. In this case, defendant chose to place a stolen parking meter on the floor of his vehicle in a location that made it plainly visible from outside the car. Although the officer in this case did not happen to notice the parking meter until he opened the car door to commence a search of the vehicle, the parking meter was plainly visible from the officer's lawful position outside the car, and the officer may well eventually have seen the parking meter even if he had decided not to search the vehicle.
¶ 47. The majority cites Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), for the principle that an officer must have actually seen the evidence in plain view before conducting any search, but Brown did not even address that issue. Indeed, it was undisputed in Brown that the seized items were in plain view  the only issue was whether the incriminating nature of those items was immediately apparent. Id. at 740-41, 103 S.Ct. 1535. The majority believes that we would be eviscerating the "fundamental evidentiary and legal grounding" of the plain-view rule by allowing the admission of a parking-meter head that, for example, was tied to a roof-rack in plain view or displayed prominently on a dashboard but not initially noticed by officers occupied with other concerns. Yet, as the Court observed in Brown, "[t]here is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." Id. at 740, 103 S.Ct. 1535 (citations omitted). Here, defendant had no legitimate expectation of privacy in the parking-meter head, given that he chose to leave it in a place that was plainly observable from outside his vehicle.
¶ 48. The second issue regarding application of the plain-view exception to this case is whether there were exigent circumstances that allowed the officer to seize the plainly visible incriminating item. According to the majority, there were no exigent *56 circumstances because the passenger had left the scene, the driver had been secured in the patrol car, the vehicle was to be impounded, and the officer was not concerned that evidence might be removed from the car. Once again, however, the majority provides an inaccurate statement of the facts in finding the absence of exigent circumstances. The majority states that the vehicle was to be impounded, but fails to indicate when the police decided that they had grounds to impound the car. The undisputed testimony of the arresting officer was that the decision to impound the vehicle or to leave it at the scene safely off of the highway  which the officer called "grounding"  was based on the results of the initial search of the vehicle and was not made before the search commenced.[10]
¶ 49. In other words, at the time of the initial search, no determination had been made that defendant's car warranted seizure or, alternatively, that it would be left at the scene.[11] The fact that the passenger had been released and had left the scene increased the possibility that she or someone else could return to the car and remove evidence in the event the car were left at the scene. As the trial court stated, "the other occupant was not arrested and the true owner's identity was not known, and therefore the lawful owner might have returned to remove the vehicle and the contraband in it." Finally, the officer's testimony that he was not concerned about *57 evidence being removed or destroyed does not demonstrate the lack of exigent circumstances because it is an objective view of the circumstances, not the officer's subjective motivation, that determines whether there was an exigency permitting the officers to seize incriminating items left in plain view.
¶ 50. In sum, the release of the passenger, the uncertainty over ownership of the vehicle, and the possibility of the police leaving the car by the roadside constituted exigent circumstances allowing the officers to conduct a warrantless seizure of incriminating evidence left in plain view in the vehicle. On this point, this case should be controlled by State v. Trudeau, 165 Vt. at 361, 683 A.2d at 729, a factually similar case in which we found exigent circumstances because defendant's vehicle "would have remained in a public parking lot, and the two other occupants of the vehicle, neither of whom were arrested, would have had access to the vehicle and the evidence contained therein." The majority makes a vain attempt to distinguish Trudeau, but cannot do so. Here, as in Trudeau, there was a passenger who could have accessed the vehicle, which may have been left unattended at the scene of the stop.
¶ 51. Thus, all three elements of the plain-view exception were satisfied in this case. On these facts, I would affirm the decision not to suppress the evidence found in the search of the car under Article 11 of the Vermont Constitution, without reaching the search-incident-to-arrest issue.[12] Cf. State v. Savva, 159 Vt. 75, 88, 616 A.2d 774, 781 (1991) (recognizing "a separate and higher expectation of privacy for containers used to transport personal possessions than for objects exposed to plain view within an automobile's interior").
¶ 52. As a second ground for affirming the denial of defendant's motion to suppress in this case, I would find that the search was proper where the circumstances indicated that the vehicle might have been stolen. One of the leading commentators on the law of search and seizure supports case law holding that it is reasonable for a police officer to make a limited warrantless search of a vehicle to determine ownership of the vehicle or to investigate the possible theft of the vehicle. 3 LaFave, supra, § 7.4(d)-(e), at 662-66. According to LaFave:
The better view is that if the driver has been given an opportunity to produce proof of registration but he is unable to do so, and even if he asserts that there is no such proof inside the car, the officer is not required to accept such an assertion at face value, at least when [the suspect's] previous conduct would . . . cast doubt upon his veracity; at that point, the officer may look for registration papers on the dashboard, sun visor and steering column and, if not found in those places or seen in plain view, in the glove compartment, [and] all places where it may reasonably be found.
Id. at 663 (internal quotations and citation omitted); accord In re Arturo D., 27 Cal.4th 60, 115 Cal.Rptr.2d 581, 38 P.3d 433, 446 (2002) (accepting LaFave reasoning and finding officer justified in conducting warrantless search of passenger compartment, including under seats, for evidence of vehicle's ownership). LaFave describes as "sound" the basic principle that if an officer has probable cause to believe that a vehicle has been the subject of a theft, he may make a limited warrantless *58 entry of the vehicle and search areas he reasonably believes might contain evidence of ownership. 3 LaFave, supra, § 7.4(e), at 664-66.
¶ 53. As noted, in this case defendant was unable to produce a valid driver's license, car registration, or proof of insurance. See 23 V.S.A. §§ 301, 307 (motor vehicle shall not be operated on highway unless vehicle is registered and registration is carried in some easily accessible place in vehicle); 23 V.S.A. § 1012(b) (operator "shall produce his or her operator's license and the registration certificate for the motor vehicle"). Further, the vehicle's license plates did not match the vehicle, see 23 V.S.A. § 513 (owner of motor vehicle shall not attach to vehicle number plates not assigned to that vehicle), and the bill of sale defendant showed to police did not indicate that defendant was the owner of the vehicle. See 23 V.S.A. § 1012(a) (operator shall give "name and address of the owner of the motor vehicle"). Given these circumstances, the police officer had a responsibility to assure himself that the vehicle had not been stolen.
¶ 54. The majority insists that no exigent circumstances existed, relying heavily on the fact that defendant had been placed in custody. To the extent that question is relevant in these circumstances, however, this Court has held that "[t]he mere placing of a suspect vehicle's occupants in custody does not extinguish exigency, if it otherwise exists." State v. Girouard, 135 Vt. 123, 132-33, 373 A.2d 836, 842 (1977). Here, the possibility that the vehicle had been stolen created exigent circumstances authorizing the officer to conduct a limited warrantless search to look for documents indicating its ownership. See People v. Todd, 35 Cal.Rptr.2d 790, 794 (Ct.App.1994) (given officer's duty to ascertain owner of vehicle to determine whether to release or impound vehicle, "statute authorizing an officer to inspect vehicle registration also authorizes the officer to enter a stopped vehicle and conduct a warrantless search for the required documents" within constitutional limits); State v. Holmgren, 282 N.J.Super. 212, 659 A.2d 939, 940 (App.Div.1995) (driver's failure to produce vehicle's registration or proof of insurance supported reasonable suspicion that vehicle was stolen and authorized police "to conduct a limited warrantless search of areas in the vehicle where such papers might normally be kept by an owner"). This would be true regardless of the officer's actual motivation underlying the search. See Todd, 35 Cal.Rptr.2d at 794 (as long as search was legally authorized, officer's "subjective intentions for his activities are not relevant").
¶ 55. The majority repeatedly relies upon the purported subjective motivations of the arresting officer in this case, and yet it is well settled that "[s]ubjective intent alone . . . does not make otherwise lawful conduct illegal or unconstitutional." Scott v. United States, 436 U.S. 128, 136, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). Indeed, "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification of the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." Id. at 138, 98 S.Ct. 1717; see Whren v. United States, 517 U.S. 806, 812, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (noting that the Supreme Court has repeatedly rejected the notion "that an officer's motive invalidates objectively reasonable behavior under the Fourth Amendment"); United States v. Robinson, 414 U.S. 218, 221 n. 1, 236, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (holding that a traffic violation arrest would not be rendered invalid merely because it was a pretext for a narcotics search, and further, that a lawful post-arrest *59 search of a person would not be rendered invalid merely because it was not motivated by officer-safety concerns). Cf. State v. Lussier, 171 Vt. 19, 23-24, 757 A.2d 1017, 1020 (2000) ("In determining the legality of a stop, courts do not attempt to divine the arresting officer's actual subjective motivation for making the stop; rather, they consider from an objective standpoint whether, given all of the circumstances, the officer had a reasonable and articulable suspicion of wrongdoing.").
¶ 56. The majority's emphasis on the officer's subjective motivation highlights the problem with decisions that have the effect of turning police officers into constitutional law scholars who have to predict the developing law and how this Court will rule. The officer understood he could search incident to the DUI arrest and gave answers related to that justification. The majority is requiring that he also understand the law relating to whether he was dealing with a stolen car and answer that he was searching for evidence of ownership of the vehicle. The reality is that officers will not invariably give the right constitutional law answer in describing the purposes of the search. The only reasonable rule has to be that the validity of the search must be based on the objective evaluation of the circumstances and not our evaluation of the level of constitutional law knowledge of the searching officer.
¶ 57. The majority also incorrectly contends that the officer did not observe any evidence of a crime in the vehicle. The officer's affidavit and testimony indicated that defendant was speeding and driving erratically. After the stop occurred, the officer smelled a faint odor of alcohol emitting from the vehicle. Further, defendant exhibited signs of intoxication, and he failed dexterity tests, which led to his arrest for driving while intoxicated. Thus, there was evidence that defendant had committed several crimes connected with the vehicle.
¶ 58. In short, either of the two grounds discussed above, and certainly both in combination, provided adequate grounds for the police to search the vehicle without a warrant for evidence of the crimes  DUI and stealing a parking meter or possessing a stolen meter  or to determine the ownership of the vehicle. Thus, we need not reach broad constitutional questions in this case.
¶ 59. This leads me to the majority's broad constitutional holding that rejects the decision of the United States Supreme Court in Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768. Before I address Belton, however, I emphasize that the majority's broad holding is unnecessary even if we hold that neither the stolen car nor plain-view exceptions apply. The majority rejects Belton in favor of the so-called "case-by-case" approach taken in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), but, in my view, an analysis under Chimel would not result in overturning the trial court's decision in this case. Chimel allows police to search areas within the reach of suspects contemporaneously with arrests to protect themselves and to prevent the destruction of evidence. 395 U.S. at 766, 89 S.Ct. 2034.[13] The officer in this case testified specifically *60 that he searched only in that area. As a practical matter, officers protect themselves by conducting searches after suspects have been arrested and secured. Yet that did not prevent courts from permitting searches and seizures conducted contemporaneously with the arrest within the area of control described in Chimel, even when the suspect had been secured before the actual search or seizure. See, e.g., United States v. Dixon, 558 F.2d 919, 922 (9th Cir.1977) (permitting, under Chimel, a search and seizure of items on a vehicle's floorboard while other officers patted down and handcuffed the suspect outside of the vehicle); United States v. Sanders, 631 F.2d 1309, 1313-14 (8th Cir. 1980) (permitting, under Chimel, a search and seizure that was conducted within the immediate vicinity of the suspects' vehicle and that "was substantially contemporaneous with the arrest," even though the officers had secured control over the suspects).
¶ 60. Moreover, in many encounters involving vehicle stops, as in the one before us, there are several suspects or passengers. In those cases, officers may search the area within the reach of any or all of those persons. See State v. Mayer, 129 Vt. 564, 567-68, 283 A.2d 863, 865 (1971) (relying on Chimel to permit search on ground that either the defendant or the defendant's girlfriend could have reached a weapon at the time of the defendant's arrest). Here, the passenger apparently remained in the car while the officer was administering field dexterity tests to defendant. Under these circumstances, Chimel would have allowed the officer to search the open inner compartment of the vehicle contemporaneously with defendant's arrest to protect himself and to preserve potential evidence. Thus, even if Belton had never been decided, and this Court were required to analyze the case under Chimel, I would affirm the trial court's denial of defendant's motion to suppress.
¶ 61. This leads me to the principal basis for my dissent, which does require an in-depth analysis of the perimeters of the search-incident-to-arrest exception to warrantless searches under Article 11 of the Vermont Constitution. Assuming this to be the controlling issue under the circumstances of this case, I would still affirm the district court's denial of defendant's motion to suppress because, in my view, the values underlying Article 11 do not prohibit police from conducting warrantless searches of the passenger compartment of automobiles following the arrest of the operator for an offense involving the use of the vehicle. The district court found both the automobile and search-incident-to-arrest exceptions to be applicable in this case. The court explained that exigent circumstances existed because the police had released defendant's companion without ascertaining whether she had keys to the vehicle, and ownership of the vehicle had not been established. The court also cited the "well-established" principle that police can lawfully conduct a warrantless search of a person and his immediate surroundings following a valid stop and arrest.
¶ 62. In support of its decision, the district court relied on Belton, the leading federal case addressing the search-incident-to-arrest exception in the context of an automobile stop. The question before the Court in that case was the following: "When the occupant of an automobile is subjected to a lawful custodial arrest, does the constitutionally permissible scope of a search incident to his arrest include the passenger compartment of the automobile in which he was riding?" Belton, 453 U.S. at 455, 101 S.Ct. 2860. The Court accepted review of this issue because the lower courts had been struggling with whether *61 or how to apply Chimel in cases involving arrests following automobile stops. Prior to Chimel, the Court had allowed a full warrantless search of a suspect's home or vehicle following the suspect's arrest. See 3 LaFave, supra, § 7.1(a), at 502 (discussing cases leading to Belton decision). In Chimel, the Court overruled that line of cases in the context of a search of a home, reasoning that the warrantless search of a suspect's home following his arrest is unreasonable under the Fourth Amendment if it extends beyond the area in which the suspect could either reach a weapon that would endanger the arresting officers or conceal or destroy evidence that could be used against him. 395 U.S. at 768, 89 S.Ct. 2034.
¶ 63. Following the decision in Chimel, the lower courts were divided on whether, or the extent to which, that holding applied in the context of the search of an automobile following the arrest of its occupant. See 3 LaFave, supra, § 7.1(a), at 503-04. Recognizing that the lower courts had found the holding in Chimel "difficult to apply in specific cases," particularly automobile stops, the Court in Belton reasoned that Fourth Amendment protections "`can only be realized if the police are acting under a set of rules which, in most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement.'" Belton, 453 U.S. at 458-59, 101 S.Ct. 2860 (quoting W. LaFave, "Case-by-Case Adjudication" Versus "Standardized Procedures": The Robinson Dilemma, 1974 S.Ct. Rev. 127, 142). According to the Court, a "`single familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront.'" Belton, 453 U.S. at 458, 101 S.Ct. 2860 (quoting Dunaway v. New York, 442 U.S. 200, 213-14, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)).
¶ 64. The Court concluded, however, that "no straightforward rule ha[d] emerged" from the litigated federal or state cases regarding "the proper scope of a search of the interior of an automobile incident to a lawful custodial arrest of its occupants." Belton, 453 U.S. at 459, 101 S.Ct. 2860. Based on its conclusion that articles within the passenger compartment of an automobile are "generally, even if not inevitably" within an area in which a suspect could reach a weapon or evidence, the Court held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." Id. at 460, 101 S.Ct. 2860. In addition, the Court held "that the police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach." Id. In Thornton v. United States, the Court further concluded "that Belton governs even when an officer does not make contact until the person arrested has left the vehicle." 541 U.S. 615, 617, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004). Thus, in the context of automobile searches following a lawful arrest, the Court rejected a case-by-case application of the Chimel rule in favor of a workable, bright-line rule that provides guidance to police officers.
¶ 65. The majority rejects the analysis of Belton, particularly the adoption of a bright-line rule, as an "abrupt shift in the standard of fourth amendment protections." Ante, ¶ 20. The so-called "abrupt shift" is actually none at all. Belton creates a bright-line rule allowing warrantless searches incident to the roadside arrest of *62 automobile occupants. The majority recognizes that the "search-incident-to-arrest doctrine" is an established exception to the warrant requirement. Ante, ¶ 15. Moreover, this Court has adopted this exception. See State v. Meunier, 137 Vt. 586, 588, 409 A.2d 583, 584 (1979) (quoting both the Fourth Amendment and Article 11, and stating that reasonable warrantless searches incident to arrest are permissible); State v. Greenslit, 151 Vt. 225, 227, 559 A.2d 672, 673 (1989) ("It is axiomatic that a search incident to a lawful arrest is constitutional.").
¶ 66. The use of a bright-line rule for searches incident to arrest is explained in United States v. Robinson where the Court rejected a case-by-case adjudication of "whether or not there was present one of the reasons supporting the authority for a search of the person incident to a lawful arrest." 414 U.S. at 235, 94 S.Ct. 467. The Court explained that neither its own "long line of authorities" nor "the history of practice in this country and in England" compelled such a result. Id. It stated: "A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick ad hoc judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search." Id. The Court further explained that the Chimel holding, on which the majority relies in this case, allows searches in areas within the immediate control of the arrestee in a home. Id. at 226, 94 S.Ct. 467. Thus, Chimel itself establishes a bright-line rule, one that the majority apparently endorses here.[14]
¶ 67. But even if we were not dealing with the definition of an accepted bright line  as opposed to creating a new one  I would reject the majority's holding that our precedents prohibit bright-line rules. In fact, our interpretations of Article 11, and the federal court interpretations of the Fourth Amendment, are essentially the same on this point. At its strongest, the federal policy on the propriety of bright-line rules was recently stated in United States v. Drayton: "[F]or the most part per se rules are inappropriate in the Fourth Amendment context. The proper inquiry necessitates a consideration of all the circumstances surrounding the encounter." 536 U.S. 194, 201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002) (citation and internal quotation omitted). The majority is correct that two of our decisions have rejected federal search-and-seizure decisions because they embodied specific bright-line rules. See Savva, 159 Vt. at 87, 616 A.2d at 781; State v. Kirchoff, 156 Vt. 1, 8, 587 A.2d 988, 993 (1991).[15] Neither decision, however, categorically rejects bright-line rules. Indeed, as noted above, the majority's endorsement of Chimel would be inconsistent with such a rejection.
¶ 68. On the other hand, in circumstances where there was a need for certainty, we adopted what is essentially a bright-line rule in State v. Martin, 145 Vt. 562, 571, 496 A.2d 442, 448 (1985), a decision *63 upholding the constitutionality of DUI roadblocks under Article 11 in controlled circumstances. We held that "[a]s a general rule, a DUI roadblock will pass constitutional muster if" it meets six specific and objective standards, one of which is that "the discretion of the officers in the field, as to the method to be utilized in selecting vehicles to be stopped, is carefully circumscribed by clear objective guidelines established by a high level administrative official." Id. The majority's assertion that "we have consistently rejected bright-line rules," ante, ¶ 20, is a gross exaggeration.
¶ 69. Hence, the proper question is not whether Belton should be rejected because it embodies a bright-line rule, but rather, whether a bright-line rule is justified in the circumstances and whether Belton embodies a reasonable bright line. I believe that the answer to the first part of the question is clearly yes. Although I believe that the Belton bright line is misplaced  and thus the answer to the second part of the question is no  I believe that the search in this case is within a reasonably drawn line so that the Belton misplaced line does not affect the outcome.
¶ 70. The reasons for a bright-line rule in cases like the present are best explained by Professor LaFave, as quoted in Belton, who explained that because the Fourth Amendment is "`primarily intended to regulate the police in their day-to-day activities,'" it "`ought to be expressed in terms that are readily applicable by the police in the context of law enforcement activities in which they are necessarily engaged." Belton, 453 U.S. at 458, 101 S.Ct. 2860 (quoting LaFave, "Case-by-Case Adjudication" Versus "Standardized Procedures": The Robinson Dilemma, 1974 S.Ct. Rev. at 141). He stated that although rules that require "subtle nuances and hairline distinctions" might be "the sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed," such rules "may be literally impossible of application by the officer in the field." Id. (internal quotations omitted). Similarly, in writing for the majority, Justice Souter recently reiterated the Court's recognition of the government's "essential interest in readily administrable rules" in this context because:
[A] responsible Fourth Amendment balance is not well served by standards requiring sensitive, case-by-case determinations of government need, lest every discretionary judgment in the field be converted into an occasion for constitutional review. Often enough, the Fourth Amendment has to be applied on the spur (and in the heat) of the moment, and the object in implementing its command of reasonableness is to draw standards sufficiently clear and simple to be applied with a fair prospect of surviving judicial second-guessing months and years after an arrest or search is made.
Atwater v. City of Lago Vista, 532 U.S. 318, 347, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) (internal citation omitted).
¶ 71. I can think of no greater example of the need to apply constitutional search-and-seizure rules "on the spur (and in the heat) of the moment" than during a roadside stop of an automobile of a likely intoxicated driver in the middle of the night. Nor are there many recurrent law-enforcement activities that are more dangerous for the officer involved. For this reason, the case for a bright-line rule involving automobile searches incident to an arrest is a strong one.
¶ 72. There is an additional reason why a bright-line rule is appropriate for automobile searches incident to the arrest of an occupant of a vehicle. In applying search-and-seizure law, courts have unanimously recognized that a vehicle is fundamentally *64 different from a home in the sense that its mobility, its function as transportation on public highways, and its extensive regulation (1) increase the likelihood of the existence of exigent circumstances justifying warrantless searches and (2) result in frequent contact between the vehicle's occupants and government authorities or members of the public in both criminal and noncriminal contexts, thereby reducing the expectation of privacy in items placed in the open passenger compartment of the vehicle. See 3 LaFave, supra, § 7.2(b), at 548.
¶ 73. People regularly expose the interior of their vehicles to public view by driving them on public streets and parking them in public places. Indeed, the many windows in the vehicle leave little in the interior of the passenger compartment, apart from that placed in closed containers, outside of public view, and thus there is little expectation of privacy in the passenger compartment of an automobile.
¶ 74. Consequently, similar to other courts, we have consistently emphasized within our Article 11 jurisprudence the distinction between searches of homes and cars. See State v. Geraw, 173 Vt. 350, 352-53, 795 A.2d 1219, 1221 (2002) (holding that our case law "underscore[s] the significance of the home as a repository of heightened privacy expectations"). This distinction is particularly highlighted in a pair of cases we decided fifteen years ago. In State v. Blow, 157 Vt. 513, 520, 602 A.2d 552, 556 (1991), we held that obtaining evidence without a warrant through surreptitious electronic monitoring in the defendant's home violated Article 11. See also Geraw, 173 Vt. at 351, 795 A.2d at 1220 (holding that Article 11 prohibits secret recording of police interviews conducted in suspect's home). In so holding, we stated that one of the core values embodied by Article 11 is "the deeply-rooted legal and societal principle that the coveted privacy of the home should be especially protected." Blow, 157 Vt. at 518, 602 A.2d at 555.
¶ 75. In contrast, in State v. Brooks, 157 Vt. 490, 494, 601 A.2d 963, 965 (1991), we held that the warrantless, electronic participant monitoring of individuals conversing through the open windows of cars parked alongside each other in a public lot did not violate the protections provided by Article 11. See also State v. Bruyette, 158 Vt. 21, 37, 604 A.2d 1270, 1278 (1992) (Dooley, J., concurring, joined by Allen, C.J., and Gibson, J.) (suggesting that secret monitoring of conversation between defendant and his girlfriend in parked car was outside protection of Article 11). In distinguishing Blow, we stated that "[t]he distinction between the reasonable expectation of privacy within the home and outside of it is well-grounded in the law and in our culture." Brooks, 157 Vt. at 493, 601 A.2d at 964. We further explained that our refusal to subject participant monitoring of individuals in their cars to the same strict standards applied to such monitoring within the home is "simply a reflection of the [less restrictive] standards that apply to nonhome searches generally." Id.; see State v. Charpentier, 131 Idaho 649, 962 P.2d 1033, 1037 (1998) (stating that extensive regulation of automobiles on public highways does not directly address issue of automobile searches, but is "indicative of the fact that the automobile is not comparable to the home" in that "[t]he expectation of privacy within the automobile falls far short of that accorded the sanctuary of the home").
¶ 76. The acknowledgment of a reduced expectation of privacy in automobiles, as opposed to homes, is incorporated directly into the automobile exception and indirectly into the search-incident-to-arrest exception to the warrant requirement. With *65 regard to the automobile exception, although we have not followed federal law in allowing warrantless searches of automobiles based on probable cause absent a particularized showing of exigent circumstances, Trudeau, 165 Vt. at 361, 683 A.2d at 729 (rejecting notion that mobility of automobiles is per se exigent circumstance allowing warrantless search), we have acknowledged that automobiles often may present exigent circumstances, and that "people may have a lesser expectation of privacy in their vehicles, which are exposed at least in part to the public eye." Savva, 159 Vt. at 83, 616 A.2d at 778.
¶ 77. In Savva, we identified the issue before us as "whether defendant had a reasonable expectation of privacy, not in the vehicle as a whole, but specifically in the contents of the brown paper bag in which the drugs, contained in plastic bags, were found," and we acknowledged that "Article 11's requirement for an expectation of privacy may not be met" if a container's contents were discernable. Id. at 89-90, 616 A.2d at 782 (emphasis added). In reversing the district court's denial of defendant's motion to suppress, we concluded that the lesser expectation of privacy in vehicles does not carry over to sealed containers within the vehicle, as the United States Supreme Court had held. Id. at 87, 616 A.2d at 781. Accordingly, we recognized "a separate and higher expectation of privacy for containers used to transport personal possessions than for objects exposed to plain view within an automobile's interior." Id. at 88, 616 A.2d at 781. Thus, our holding in Savva is narrowly restricted to closed containers within vehicles and, in fact, recognizes a diminished expectation of privacy in items placed in the open passenger compartment of vehicles.
¶ 78. Like the automobile exception, Belton's bright-line rule allowing police to search the passenger compartment of a vehicle following the lawful arrest of its occupants is based, at least in part, on the mobility of, and reduced expectation of privacy in, automobiles. See Girouard, 135 Vt. at 132-33, 373 A.2d at 842. Yet, the majority has simply ignored this distinction, holding that a rule created for the home in Chimel should be applied without any modification to an automobile. This is the real "abrupt shift in the standard of Fourth Amendment protections" in this case.
¶ 79. It is important to understand that the majority has not only refused to adopt a bright-line rule, but it has gone as far in the opposite direction as is realistically possible by requiring a showing of exigent circumstances on a case-by-case basis. Anyone who reads both the majority's and the dissent's analysis of the presence of exigent circumstances in Trudeau, and the majority's attempt to distinguish Trudeau from this case, will immediately recognize that it is difficult to predict whether exigent circumstances can be found. Many courts have noted that "exigent circumstances" are difficult to define even in the context of deliberate and painstaking review based on appellate hindsight. See State v. Aviles, 277 Conn. 281, 891 A.2d 935, 944 (2006) (recognizing that the term exigent circumstances "does not lend itself to a precise definition") (quotation and citation omitted); State v. Clark, 65 Haw. 488, 654 P.2d 355, 360 (1982) (same); State v. Wren, 115 Idaho 618, 768 P.2d 1351, 1356 (Ct.App.1989) (same); State v. Nishina, 175 N.J. 502, 816 A.2d 153, 162 (2003) (same). Requiring a showing of exigent circumstances on a case-by-case basis in the context of a search incident to a highway arrest is not a workable policy.
¶ 80. The majority asks that a lone police officer who stops a vehicle at two o'clock in the morning not only be a constitutional *66 law expert but also exercise twenty-twenty hindsight on whether a majority of this Court will find exigent circumstances.[16] No law enforcement system can operate this way safely and effectively. The majority's case-by-case exigent circumstances regime is the equivalent of holding that a vehicle cannot be searched incident to an arrest of an occupant of the vehicle.
¶ 81. In the majority's view, the only advantage to a bright-line rule is "law-enforcement efficiency" and "administrative simplicity." As I said in the opening of this dissent, the majority has trivialized very important interests in officer safety and evidence gathering, making them seem insignificant when balanced against the privacy interests of citizens. But we have not always been so hostile to the realities of limited resources available for law enforcement functions. In State v. Oakes, in response to an argument that a consensual search of defendant's home had been discontinued and required new authority to be recommenced, we explained:
The discontinuity of the investigation was, in some measure, due to the limitations implicit in police work in most Vermont villages. The small manpower of the local force must, of necessity, be supplemented by the personnel and the expertise the state police can furnish, once they arrive. . . . Delay, or interruption of police presence at the premises, on this account, does not undercut the right of the police to complete, within a reasonable time, their investigative work, or require a renewed authority to enter.
129 Vt. 241, 252, 276 A.2d 18, 25 (1971). Similarly, the realities of lone officers stopping vehicles in the middle of the night necessarily must inform the choices available to the officer to protect his or her safety and discharge the law-enforcement function.
¶ 82. As for the majority's main objection to a bright-line rule authorizing a search of a vehicle  that the arrested occupant is often restrained such that he or she could never reach a weapon or destroy evidence by the time the search occurs  the best response is to examine the nature of automobile stops. The majority attributes the circumstance of a secured suspect to the recent decision in Thornton, 541 U.S. 615, 124 S.Ct. 2127, 158 L.Ed.2d 905, but it was also true in Belton and virtually every search-incident-to-arrest case in the automobile context. It was also probably true in Chimel and virtually every search-incident-to-arrest case where the search goes beyond the person. The reason is simple: no police officer should or would ever leave a suspect who is to be arrested unrestrained while the officer conducts a search. See M. Moskovitz, A Rule in Search of a Reason: An Empirical Reexamination of Chimel and Belton, 2002 Wis. L.Rev. 657, 676, 696 (describing "common sense" need of police to restrain suspect upon arrest). Self-protection generally demands restraint of the suspect first. Thus, the majority's objection is really to the "grab rule" of Chimel and not to the bright line established in Belton. See id. at 677.
¶ 83. There are very important reasons for a "grab rule," and they are particularly strong for vehicle searches, which often involve more than one occupant of the vehicle. To ensure their safety, police must be cognizant of the potential threat *67 posed not only by the suspect, but also by the suspect's companions. For example, in an early post-Chimel Vermont case, Mayer, defendant was arrested in a motel room also occupied by his female companion. 129 Vt. at 566, 283 A.2d at 864. The search incident to the arrest of defendant recovered a gun located under the pillows to the bed occupied by the female companion. Id. In response to the argument that the police had searched outside the "grab area," this Court said:
Upon entering the motel room . . . it was an essential security function for the enforcement officers to search the accused and the area within his reach. It was equally reasonable that the protective search extend to the area within reach of his female companion. It appears that the weapon was within the grasp of both. Until the weapon was secured, either occupant of the room had the capability of impeding the arrests and endangering the lives of those present.
Id. at 567-68, 283 A.2d at 865. Just as the officer was permitted to search the motel bed in Mayer, the officer in this case must be able to search the passenger compartment of defendant's vehicle, which was occupied by defendant's companion while defendant was performing dexterity tests. Even if the issue were solely personal security, it is unacceptable to put the officer in the position of making a constitutional calculation of whether the restrained defendant can reach a gun or whether another occupant is likely to do so.
¶ 84. The majority tries to avoid these security interests by "factualizing" the case, see generally W. LaFave, Being Frank About the Fourth: On Allen's "Process of `Factualization' in the Search and Seizure Cases", 85 Mich. L.Rev. 427 (1986), to say there is no security concern. Thus, in its introductory paragraph it characterizes the question in this case as: "whether law-enforcement officers may routinely search a motor vehicle without a warrant, after its occupant has been arrested, handcuffed, and secured in the backseat of a police cruiser, absent a reasonable need to protect the officers' safety or preserve evidence of a crime." Ante, ¶ 1. In fact, its categorical rejection of Belton and any alternative to Belton that involves a bright-line review represents a far broader holding than its statement of the issue admits. Thus, its holding is much broader than the facts of this case and involves many instances where security of the officer is the prime concern.
¶ 85. The majority responds that there is no proof that stopping vehicles is inordinately dangerous. In fact, the evidence is powerful. Relying on a published study, the United States Supreme Court noticed and relied upon that danger in Adams v. Williams, 407 U.S. 143, 148 n. 3, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972): "[A]pproximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile." The Court reiterated and relied on this evidence in Pennsylvania v. Mimms, 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (noting the "inordinate risk confronting an officer as he approaches a person seated in an automobile") and more recently in Michigan v. Long, 463 U.S. 1032, 1048-49, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). The United States Court of Appeals recently amplified and updated the statistics in United States v. Holt, 264 F.3d 1215, 1223 (10th Cir.2001) (en banc) (noting that "in 1999, 6,048 officers were assaulted during traffic pursuits and stops and 8 were killed," based on FBI statistics). The court concluded from the evidence:
The terrifying truth is that officers face a very real risk of being assaulted with a dangerous weapon each time they *68 stop a vehicle. The officer typically has to leave his vehicle, thereby exposing himself to potential assault by the motorist. The officer approaches the vehicle not knowing who the motorist is or what the motorist's intentions might be. It is precisely during such an exposed stop that the courts have been willing to give the officers wide latitude to discern the threat the motorist may pose to officer safety.
An officer in today's reality has an objective, reasonable basis to fear for his or her life every time a motorist is stopped. Every traffic stop, after all, is a confrontation. The motorist must suspend his or her plans and anticipates receiving a fine and perhaps even a jail term. That expectation becomes even more real when the motorist or a passenger knows there are outstanding arrest warrants or current criminal activity that may be discovered during the course of the stop. Resort to a loaded weapon is an increasingly plausible option for many such motorists to escape those consequences, and the officer, when stopping a car on a routine traffic stop, never knows in advance which motorists have that option by virtue of possession of a loaded weapon in the car.
Id. at 1223 (internal quotation and citation omitted).[17]
¶ 86. Here, in addition to issues of safety, there was the potential of lost evidence. The single officer who initiated the stop had to leave the passenger in the darkened vehicle while the defendant performed the dexterity tests. We know that the passenger did not use a weapon at that time, although she could have done so, but we do not know what evidence she may have removed from the vehicle. Although the officer testified that she had left the scene by the time of the search, it is impossible to know how far away she went in the middle of the night. For all the officer knew, she could have returned later to remove evidence. Moreover, if there had been no vehicle search and defendant had been released after DUI processing as normally occurs, he could have returned and driven the vehicle away.
¶ 87. My point is that, irrespective of the timing of the arrest or search, or the restraint or release of passengers for whom there is no probable cause to arrest, a bright-line rule is necessary to protect the officer and the evidence at the scene. See State v. Watts, 142 Idaho 230, 127 P.3d 133, 137 (2005) (stating importance of knowing that "when an arrest has been made of the occupant or occupants of an automobile . . . the automobile can be left untended with the assurance that any weapons, evidence of crime or contraband have been removed from the reach of passersby or confederates in unlawful activity"). The limited expectation of privacy in the passenger compartment of the automobile, as opposed to a home, justifies a bright-line rule to search the full extent of the passenger compartment.
*69 ¶ 88. As the majority reluctantly acknowledges, most states have followed Belton and embraced a bright-line rule for searches incident to arrest. See Vasquez v. State, 990 P.2d 476, 483 n. 3 (Wyo.1999) (citing cases accepting and rejecting Belton); see also Stout v. State, 320 Ark. 552, 898 S.W.2d 457, 460 (1995) (declining to diverge from Belton rule under Arkansas Constitution because of great difficulty in balancing competing interests in this area and because of workable nature of Belton rule); State v. Waller, 223 Conn. 283, 612 A.2d 1189, 1193-94 (1992) (reaffirming that Belton rule governs under state constitution even if arrestee was handcuffed and placed in police cruiser before search); State v. Sanders, 312 N.W.2d 534, 539 (Iowa 1981) (concluding that Belton rule "strikes a reasonably fair balance between the rights of the individual and those of society"); State v. Murrell, 94 Ohio St.3d 489, 764 N.E.2d 986, 991-92, 993 (2002) (overruling previous case law and joining majority of other states in adopting Belton under state constitution); Charpentier, 962 P.2d at 1037 (adopting Belton under Idaho Constitution as clear rule that gives guidance and protection to police without unduly restricting public's expectation of privacy); State v. Fry, 131 Wis.2d 153, 388 N.W.2d 565, 574-75 (1986) (adopting Belton under Wisconsin Constitution as simple and reasonable rule that fosters uniformity and predictability).
¶ 89. Indeed, notwithstanding "the drumbeat of scholarly opposition to Belton," State v. Eckel, 185 N.J. 523, 888 A.2d 1266, 1272-73 (2006), the vast majority of state courts have recognized the reduced expectation of privacy in automobiles and the need for a bright-line rule to allow vehicle searches following a lawful arrest. See generally E. Shapiro, New York v. Belton and State Constitutional Doctrine, 105 W. Va. L.Rev. 131 (2002) (discussing jurisdictions accepting, modifying, and rejecting Belton). For example, the Washington Supreme Court drew a bright-line rule slightly narrower than that in Belton under its state constitution by holding that immediately following an arrest, even if the suspect has been handcuffed and placed in a patrol car, the police may "search the passenger compartment of a vehicle for weapons or destructible evidence," but may not search a locked container or glove compartment. State v. Stroud, 106 Wash.2d 144, 720 P.2d 436, 441 (1986).
¶ 90. Other states, such as New York, Oregon, and Wyoming, have relied on the reasoning underlying both the automobile and search-incident-to-arrest exceptions to allow police to conduct limited searches of the passenger compartment of automobiles following an arrest to obtain evidence related to the crime for which the suspect was arrested.[18] For example, the Supreme *70 Court of Oregon has "expanded the justification for a search incident to arrest beyond considerations of the officer's safety and destruction of evidence to permit a reasonable search when it is relevant to the crime for which defendant is being arrested." State v. Lowry, 295 Or. 337, 667 P.2d 996, 1003 (1983) (internal quotations and citation omitted). Under this approach, in essence, the arrest itself provides the probable cause basis for the search. See State v. Fesler, 68 Or.App. 609, 685 P.2d 1014, 1016 (1984).
¶ 91. Similarly, although the New York Court of Appeals did not adopt Belton's bright-line test under its state constitution, it recognized that "when the occupant of an automobile is arrested, the very circumstances that supply probable cause for the arrest may also give the police probable cause to believe that the vehicle contains contraband, evidence of the crime, a weapon or some means of escape." People v. Blasich, 73 N.Y.2d 673, 543 N.Y.S.2d 40, 541 N.E.2d 40, 43 (1989). In light of the inherent mobility of, and reduced expectation of privacy in, automobiles, the court held that police may contemporaneously search the passenger compartment of a vehicle, including any containers found therein, following a valid arrest if they have reason to believe that the vehicle may contain evidence related to the crime for which the occupant was arrested. Id. at 43-44.
¶ 92. In particular, courts have employed this rule following arrests for DUI. For instance, while rejecting the full reach of Belton, the Wyoming Supreme Court held that its state constitution authorized police to search the passenger compartment of a vehicle for evidence of DUI, the offense for which the driver was arrested. Vasquez, 990 P.2d at 488. According to the court, "[t]he characteristics of a driving while under the influence arrest for suspected alcohol intoxication permit a search of the passenger compartment of the vehicle for any intoxicant, alcohol or narcotic, as evidence related to the crime of driving while under the influence." Id.; see also State v. Brody, 69 Or.App. 469, 686 P.2d 451, 453 (1984) (holding that once officers arrested suspect for DUI, it was reasonable for them to search cab for evidence of crime, but not to expand search to closed containers).
¶ 93. This brings me to what should be the question in this case if we reach a broad constitutional holding: Where should the bright line be established? I believe that a bright-line rule allowing officers to search the passenger compartment of vehicles for evidence of the crime for which an occupant of the vehicle was lawfully arrested is completely consistent with our case law and the values Article 11 protects. It would be inconsistent with Article 11, however, to grant a broader authorization for searches of automobiles because in Savva we held that a warrant was necessary before police could search items or areas  such as closed containers or compartments  in which a person had demonstrated a legitimate expectation of privacy. I see no reason to revisit Savva and thus would not adopt the full extent of the Belton holding allowing essentially a complete search of a vehicle, including any closed containers within the vehicle, following an arrest. But, as the majority of state courts have recognized, a bright-line rule allowing searches of a vehicle's passenger compartment, most of which can be viewed from outside the vehicle, does not unduly infringe upon reasonable expectations *71 of privacy of those operating motor vehicles on our highways.
¶ 94. When an operator or occupant of a vehicle is arrested for DUI, a crime that is committed with the vehicle, it is eminently reasonable to allow police to conduct a warrantless search of the open passenger compartment of the vehicle for evidence related to the crime, such as alcohol or other drugs.[19] There is plainly a logical inference supporting a conclusion that the passenger compartment may contain evidence of the crime. See State v. Towne, 158 Vt. 607, 616, 615 A.2d 484, 489 (1992) (rejecting more-likely-than-not standard for probable cause, and instead requiring only nexus between crime, suspect, and place to be searched). Moreover, as we have often recognized, the occupant of a vehicle has only a limited expectation of privacy in items placed in the passenger compartment of a vehicle. See 3 LaFave, supra, § 7.2(c), at 563 ("[P]erhaps a warrantless search of a vehicle is sometimes reasonable even if there is lacking that amount of particularity concerning what is sought which would be needed to search a house or apartment."); Murrell, 764 N.E.2d at 992 ("Concerns about a possible lack of probable cause to conduct a search in a Belton situation are eased by the fact that probable cause must have been present to arrest the occupant of the vehicle in the first place.").
¶ 95. In this case, defendant was lawfully arrested after he showed indicia of intoxication and failed dexterity tests. A police check revealed that the records of the Department of Motor Vehicles did not show defendant as the registered owner of the vehicle. Furthermore, defendant was unable to produce a bill of sale with his name on it and had only a vague explanation for how he had obtained the vehicle's plates. Finally, the vehicle's passenger was released from the scene, and, until they completed the initial search of the passenger compartment of the vehicle, the police were unsure whether they were going to impound, or merely ground, the vehicle. Under these circumstances, it was entirely reasonable for the officers to conduct a brief, warrantless search of the open passenger compartment of the vehicle to secure any evidence related to defendant's arrest for DUI and to determine the owner of the vehicle. Where the vehicle is essentially the instrument of the serious offense of drunken driving, police should be allowed to search the passenger compartment of the vehicle to prevent the loss of evidence related to that offense.
¶ 96. The majority's opinion suggests that the arresting officer was on a fishing expedition, but even assuming the relevance of the officer's subjective motivation, he expressly testified that his initial concern was "evidence of the [DUI] in relation to the [DUI] arrest  whether it's beer bottles, prescription pills, drugs, that sort of thing that would have impaired that particular person." This Court has explicitly rejected a motive-based rationale in almost exactly the same context in a previous decision. See Trudeau, 165 Vt. at 360, 683 A.2d at 728 (stating that it was irrelevant with respect to officer's motives that police did not retain partially full beer can as evidence following DUI arrest, given that State's reliance on officer's testimony regarding beer can made retention of can as physical evidence unnecessary). In my *72 view, the officer's actions in this case were reasonable and did not violate values protected by Article 11.
¶ 97. In conclusion, I repeat that the broad constitutional ruling of the majority is wholly unnecessary if we decide this case under the settled law that is applicable. If we must decide the constitutional question, however, I cannot accept the majority's answer. The rule that the majority announces today will seriously impede legitimate law-enforcement activities and increase the danger to law-enforcement officers, without providing any real benefit for the privacy interests of Vermont citizens. Accordingly, I would affirm the district court's denial of defendant's motion to suppress. I respectfully dissent.
¶ 98. REIBER, C.J., dissenting.
I respectfully dissent from the majority's holding that the search in this case was unconstitutional. I agree with the majority that the search was not justified by the plain-view exception to the warrant requirement, ante, ¶¶ 28-31, or by the search-incident-to arrest doctrine, ante, ¶¶ 15-26. However, I concur with my dissenting colleague's position that the search was justified by the circumstances indicating that the vehicle might have been stolen, and would affirm on that narrow ground, as articulated ante, ¶¶ 52-54.
NOTES
[1] The officer testified several times to the effect that "the car wasn't going to be driven because we had no documentation of who it belonged to, that it was registered or that it was insured." In other words, the decision to "ground" the car was made before the initial search, based on the lack of proof of ownership. Later, based on the evidence obtained during the search, the officers determined that the vehicle would be impounded and a warrant obtained for a more thorough search. With respect, the dissent is simply mistaken in asserting that the decision to ground the vehicle was made after the search.
[2] The full text of Article 11 reads:

That the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure; and therefore warrants, without oath or affirmation first made, affording sufficient foundation for them, and whereby by any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his, her or their property, not particularly described, are contrary to that right, and ought not to be granted.
Vt. Const. ch. I, art. 11.
[3] The dissent's assertion that State v. Martin, 145 Vt. 562, 496 A.2d 442 (1985), represents "essentially a bright-line rule" adopted by this Court, post, ¶ 68, is well wide of the mark. There, we rejected the claim that DUI roadblocks "constitute a per se violation of the Fourth Amendment," id. at 565, 496 A.2d at 445, adopting instead a balancing test "directly related to the characteristics of the DUI roadblock in each case." Id. at 570, 496 A.2d at 448 (emphasis added). This is the opposite of a bright-line standard.
[4] Although the word "unreasonable" does not appear in the text of Chapter I, Article 11 of the Vermont Constitution, see supra, note 2, we have consistently construed the provision to forbid only unreasonable searches and seizures. State v. Record, 150 Vt. 84, 85, 548 A.2d 422, 423 (1988). As discussed above, we have also consistently held that warrantless searches are presumptively unreasonable unless justified by a well-recognized exception. State v. Mountford, 171 Vt. 487, 493, 769 A.2d 639, 646 (2000), abrogated on other grounds by Brigham City, Utah v. Stuart, ___ U.S. ___, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006).
[5] As the dissent notes, this variation also appears to have been endorsed by Justice Scalia in a concurring opinion in Thornton. While sharply criticizing Belton, Justice Scalia nevertheless opined that, "[i]f Belton searches are justifiable, it is not because the arrestee might grab a weapon or evidentiary item from his car, but simply because the car might contain evidence relevant to the crime for which he was arrested." 541 U.S. at 629, 124 S.Ct. 2127 (Scalia, J., concurring).
[6] The dissent asserts that we mischaracterize the record "with respect to whether the parking meter was in plain view." Post, ¶ 43. Not so. The officer's testimony was clear, unequivocal, and undisputed that he did not observe the parking meter from outside the vehicle, and was unaware of its existence until it was discovered during the vehicle search.
[7] Contrary to the assertion of the dissent, we neither "emphasize" nor "repeatedly" rely on the office's subjective perception that he did not feel threatened or pressed to preserve evidence. We merely note the officer's testimony in this regard as further proof of the absence of evidence of exigent circumstances in this case.
[8] To be sure, other courts have held that, under the traditional automobile exception to the warrant requirement, a driver's failure to produce documentation of ownership may establish a reasonable suspicion that the vehicle is stolen and thereby establish the basis for a limited search of the vehicle in those places, such as the glove compartment or sun visor, where such documents are normally stored. See, e.g., State v. Holmgren, 282 N.J.Super. 212, 659 A.2d 939, 940 (App.Div.1995) (holding that failure to produce registration allows search of vehicle for evidence of ownership "confined to the glove compartment or other area where a registration might normally be kept in a vehicle") (quotations omitted); State v. Barrett, 170 N.J.Super. 211, 406 A.2d 198, 200 (Law Div.1979) (invalidating search of vehicle for registration where there was "no expectation that any indicia of title would be found in the rear of the vehicle"). Other courts have even held that such proof of ownership might be found in places other than the glove compartment, such as under seats. In re Arturo D., 27 Cal.4th 60, 115 Cal.Rptr.2d 581, 38 P.3d 433, 446-47 (2002). These cases rely, however, on either the Fourth Amendment or a state equivalent under which exigent circumstances have not been deemed to be an essential element of a warrantless automobile search. As noted, our law is directly to the contrary.
[9] The study to which the dissent refers, post, ¶ 85, and which has been cited by the United State Supreme Court on several occasions, shows the high frequency of shootings of police officers as they "approach a suspect seated in an automobile." Adams v. Williams, 407 U.S. 143, 148 n. 3, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). That is not the situation here. Indeed, the study in question is particularly inapposite in the search-incident-to-arrest context, where studies have shown that, in fact, police officers invariably remove suspects from anywhere near their vehicles and often  as here  handcuff and place them in the back seat of the police cruiser, where there is no risk of their gaining access to a weapon or evidence in the detained vehicle. See M. Moskovitz, A Rule in Search of a Reason: An Empirical Reexamination of Chimel and Belton, 2002 Wis. L.Rev. 657, 676 (observing that a survey of police practices reveals that "Belton's generalization that articles inside the relatively narrow compass of the passenger compartment of an automobile are in fact generally, even if not inevitably, within the area into which an arrestee might reach in order to grab a weapon or evidentiary item is  at least in general  false" (quotation omitted)); 3 LaFave, supra, § 7.1(c), at 525 (observing that, because "the police can, and typically do, immediately remove the arrestee from the vehicle," close and lock his or her vehicle, and place him or her in handcuffs, "the `difficulty' and `disarray' the Belton majority alluded to has been more a product of the police seeing how much they could get away with (by not taking the above-mentioned procedures) than their being confronted with inherently ambiguous situations").
[10] Despite the majority's criticism in footnote one, I emphasize that the officers did not decide what to do with the car until after the search. Moreover, because "grounding" simply involves leaving the car where it is stopped, anyone could come along and drive the car away. Grounding in that sense does not involve a seizure at all.
[11] Ironically, the majority's version of the facts brings us to another clearly applicable ground to validate the search. If, as the majority suggests, the arresting officer had determined from the onset of his encounter with defendant that the vehicle was to be seized and impounded, then the evidence could have been admitted pursuant to the inevitable-discovery rule, which is an exception to the exclusionary rule. Under that rule, illegally obtained evidence will not be suppressed if the prosecution demonstrates that the seized evidence would have been obtained inevitably even if there had been no, statutory or constitutional violation. United States v. Mendez, 315 F.3d 132, 137 (2d Cir.2002); Nix v. Williams, 467 U.S. 431, 440, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (noting that the "vast majority of all courts, both state and federal, recognize an inevitable discovery exception to the exclusionary rule" (internal quotation omitted)). Here, the trial court declined to apply that rule because the officer was unable to testify as to any established written policy that the South Burlington Police Department had regarding inventory searches of impounded cars. Ironically, in the case that the trial court relied on, which has similar facts to the instant case, the United States Court of Appeals for the Second Circuit admitted evidence pursuant to the inevitable-discovery rule based on the police department's unwritten inventory search policy. Mendez, 315 F.3d at 138-39. In any event, the purpose of requiring an established policy is to assure that police have limited discretion in terms of how inventory searches are conducted, not necessarily to foreclose application of the inevitable-discovery rule in the absence of such a policy. See 6 W. LaFave, Search and Seizure § 11.4(a), at 278-79 (4th ed. 2004) (noting that "[c]ircumstances justifying application of the `inevitable-discovery' rule are most likely to be present" where evidence would have been revealed pursuant to standardized procedures or established routines). Here, even if the South Burlington Police Department had imposed the most severe limitations imaginable with respect to inventory searches, any inventory of the impounded vehicle would have immediately revealed the parking-meter head laying in plain view. Therefore, if the arresting officer had in fact determined before he searched the vehicle that it was to be impounded, admission of the incriminating evidence in this case would have been admissible under the inevitable-discovery rule.
[12] After opening the car door, the investigating officers also observed (1) a glass jar containing a green leafy substance on the floor behind, not underneath, the driver's seat, and (2) a small pipe easily visible in an open compartment of a side door.
[13] Contrary to the majority's assertion, however, neither Chimel nor its progeny has required a showing of "exigent circumstances" to justify a search incident to an arrest. See ante, ¶ 21. Exigent circumstances is a legal term of art that has been applied to automobile searches. Chimel did not even involve the search of an automobile. In effect, Chimel narrowed the area that could be searched incident to arrest, thereby creating a bright-line "grab rule," but did not incorporate a requirement that there be a showing of exigent circumstances.
[14] I say "apparently endorses" because the majority also requires a showing of exigent circumstances in the individual case, a requirement wholly inconsistent with Chimel and the cases that apply it, including Robinson.
[15] I do not think that State v. Sprague, 2003 VT 20, 175 Vt. 123, 824 A.2d 539, the main case relied on by the majority, should be seen as an example of a rejection of a federal decision because it embodied a bright-line rule. If the issue is the bright-line nature of the federal rule, the decision essentially trades one bright-line rule for another. It does not call for application of the totality of the circumstances to determine whether an exit order is constitutionally valid.
[16] Without attempting to explain how an officer will make the decisions the majority requires, the majority simply responds that "support for the assumption that case-by-case evaluations are unworkable in the context of warrantless vehicle searches is simply lacking." Ante, ¶ 25. At some point, the obvious needs no further support.
[17] The majority responds to the clear evidence of danger to officers with the argument that the evidence is irrelevant because defendant was under arrest in the police car when the vehicle was searched. As I emphasized above, however, no reasonable officer will leave a suspect unrestrained in order to conduct a search. On the other hand, many suspects will return to their vehicles, and many vehicles will be left with passengers. The rule that the majority announces today will leave the officer exposed to danger in either of these circumstances. The statistics in Holt, 264 F.3d at 1223, are based on circumstances where, as is the case in the vast majority of jurisdictions, the officer can reduce or eliminate the risk from passengers and returning operators by searching for weapons. If the risk shown by the statistics is so great with the power to search, it must be even greater without the power to search.
[18] This approach is also favored by Justice Scalia, who proposed it in a concurrence joined by Justice Ginsburg. Thornton, 541 U.S. at 630, 124 S.Ct. 2127 (Scalia, J., dissenting). As Justice Scalia explained:

There is nothing irrational about broader police authority to search for evidence when and where the perpetrator of a crime is lawfully arrested. The fact of a prior lawful arrest distinguishes the arrestee from society at large, and distinguishes a search for evidence of his crime from general rummaging. Moreover, it is not illogical to assume that evidence of a crime is most likely to be found where the suspect was apprehended.
Id. Thus, Justice Scalia would allow a search of a vehicle following the arrest of its occupants "where it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." Id. at 632, 124 S.Ct. 2127. This approach has gained some favor on the Supreme Court, and, according to one leading commentator, there is a "distinct possibility" that Justice Scalia's position will eventually win the day. 3 LaFave, supra, § 7.1(c), at 534. The Scalia approach would allow a search in this case, and indeed evidence related to the crime of DUI was found.
[19] The majority criticizes this rule by raising hypothetical questions about its scope and extent, as if any legal rule was ever beyond debate. In my opinion, this criticism is an application of the observation of Justice Rehnquist that "[o]ur entire profession is trained to attack `bright lines' the way hounds attack foxes." Robbins v. California, 453 U.S. 420, 443, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981) (Rehnquist, J., dissenting).