Filed 11/25/24

VERMONT SUPERIOR COURT

Washington Unit
65 State Street
Montpelier VT 05602
802-828-2091
www.vermontjudiciary.org



CIVIL DIVISION

Case No. 24-CV-01621

---

Vermont Office of the Auditor of Accounts et al v. Vermont Office of the Attorney General et al

---

Opinion and Order on the Attorney General's Motion to Dismiss

This is a highly unusual case pitting two executive actors against each other.
Plaintiff Douglas Hoffer in his official capacity as Vermont's Auditor of Accounts (the
Auditor) and in his individual capacity (Citizen Hoffer) has sued Defendant Charity
Clark exclusively in her official capacity as Vermont's Attorney General (the AG) and the
Attorney General's Office (collectively, the AG),[1] claiming that the AG has refused to
provide legal opinions to the Auditor on two questions of law in violation of 3 V.S.A. § 159
and has refused to authorize the Auditor to retain private counsel to sue her as a result,
which the Auditor has done in any event.[2]

Plaintiffs seek relief in the nature of *mandamus* under Vt. R. Civ. P. 75 compelling
the AG to provide the requested opinions, declaratory relief stating that the AG has
violated § 159 by not having done so, and declaratory relief affirming the Auditor's power

---

[1] The Court sees no difference in the context of this case between a claim against the
Attorney General in her official capacity and a claim against the Attorney General's
Office.

[2] This is the second such suit. Plaintiffs initially filed an identical action in the
Chittenden Civil Division, which was dismissed without prejudice on venue grounds.

to bring this suit and providing that the AG should have authorized the Auditor to hire private counsel to sue the AG to compel those opinions.[3]

The AG has filed a motion to dismiss for lack of subject-matter jurisdiction and for failure to state a claim. Vt. R. Civ. P. 12(b)(1) and (6). She argues that: (1) the claims are moot because the Auditor's report for which the legal opinions were relevant has been issued; (2) neither the Declaratory Judgments Act, 12 V.S.A. §§ 4711–4725, nor a Rule 75 *mandamus* claim can be used to "appeal" advice provided under 3 V.S.A. § 159, compel any particular advice under that statute, or put the judiciary in the position of supervising the AG's internal interactions with other State officers; (3) the Auditor's constitutional powers are limited to those expressed in statute and do not authorize him to bring this action; and (4) Citizen Hoffer lacks standing to bring any of these claims.

I.     The Law Governing Dismissals

A.     The Rule 12(b)(1) Standard

As the Vermont Supreme Court has described, when considering a motion to dismiss for lack of subject matter jurisdiction, "'all uncontroverted factual allegations of the complaint [are] accepted as true and construed in the light most favorable to the nonmoving party. . . . [and a] court may consider evidence outside the pleadings.'" *Mullinnex v. Menard*, 2020 VT 33, ¶ 8, 212 Vt. 432, 438–39 (quoting *Conley v. Crisafulli*, 2010 VT 38, ¶ 3, 188 Vt. 11, 14).

---

[3] Plaintiffs have asserted that, if *mandamus* is the improper avenue for review, then they request the opportunity to amend the complaint to seek relief in the nature of *certiorari*. A writ of *certiorari*, when otherwise appropriate, is available to review judicial or *quasi*-judicial decisions. *See Preston v. Burlington City Ret. Sys.*, 2013 VT 56, ¶ 14, 194 Vt. 147, 153–54. There is no judicial or *quasi*-judicial decision at issue in this case. Any request seeking the opportunity to raise such a claim would be unfounded and legally futile.

### B. The Rule 12(b)(6) Standard

The Vermont Supreme Court disfavors Rule 12(b)(6) motions to dismiss. "Dismissal under Rule 12(b)(6) is proper only when it is beyond doubt that there exist no facts or circumstances consistent with the complaint that would entitle Plaintiff to relief." *Bock v. Gold*, 2008 VT 81, ¶ 4, 184 Vt. 575, 576 (mem.) (*citing Union Mut. Fire Ins. Co. v. Joerg*, 2003 VT 27, ¶ 4, 175 Vt. 196, 198)). In considering a motion to dismiss, the Court "assume[s] that all factual allegations pleaded in the complaint are true, accept[s] as true all reasonable inferences that may be derived from plaintiff's pleadings, and assume[s] that all contravening assertions in defendant's pleadings are false." *Mahoney v. Tara, LLC*, 2011 VT 3, ¶ 7, 189 Vt. 557, 558–59 (mem.) (internal quotation marks, brackets, and ellipses omitted). It is not required to accept Plaintiff's alleged legal conclusions, however. *Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 10, 184 Vt. 1, 9.

The Court evaluates the motion to dismiss under those standards.

### II. Factual Background

The factual record consists of the allegations of the complaint and its 6 attachments. Those filings do not document all the relevant back and forth between the Auditor and the AG, but they do so well enough to reveal the controverted issues in this case. The AG's motion to dismiss does not otherwise depend on any extra-record materials.[4]

---

[4] The AG submitted with the motion to dismiss 3 exhibits related to a previous lawsuit brought by a previous Auditor that was withdrawn by a previous Attorney General. The Court has no need to rely upon those exhibits.

The controversy in this case arose in the course of a statutorily required "performance audit" of a Burlington tax increment financing (TIF) district conducted by the Auditor. *See generally* 24 V.S.A. §§ 1891–1904 (tax increment financing). "The purpose of tax increment financing districts is to provide revenues for improvements that serve the district and related costs, which will stimulate development or redevelopment within the district, provide for employment opportunities, improve and broaden the tax base, or enhance the general economic vitality of the municipality, the region, or the State." 24 V.S.A. § 1893. Performance audits of TIF districts "shall include a review of a municipality's adherence to relevant statutes and rules adopted by the Vermont Economic Progress Council [VEPC]." 32 V.S.A. § 5404a(l).

Burlington had issued bonds to raise funds for the TIF district in a manner that generated what is known as "bond premium." Put simply, bond premium results when the bond offering is structured to pay an inflated amount of interest, inducing investors to pay more for the bonds than their nominal value. The excess proceeds in relation to principal amount are referred to as the premium.

Vermont's TIF statutes and TIF rules are silent as to the propriety of structuring a bond offering to generate premium and, if permitted, how a municipality must notice such an offering and obtain regulatory and voter approvals. For the TIF district at issue, Burlington followed the advice of its bond lawyer and structured the bond offering to generate premium, raising more funds from investors than the advertised and approved principal amount of the offering, a practice the Auditor has criticized but which is asserted, by Burlington's bond lawyer anyway, to be a sensible and accepted industry practice.

Confronted with a perceived gap in applicable statutes and regulations, the Auditor came to believe that he could not effectively "review" Burlington's "adherence to relevant statutes and rules," 32 V.S.A. § 5404a(l), without legal advice resolving (at least potentially) how the generation of bond premium sits with the requirements of Vermont's TIF statutes and rules, which, as noted, do not expressly address the subject matter. As the briefing in this case shows, the Auditor also insists that the legal advice he seeks must come exclusively from the AG. Legal advice from any other attorney that he might consult, he asserts, would inevitably create the impression that he cherry-picked a lawyer lacking integrity and professionalism who would say whatever the Auditor wanted, despite the Auditor's own professional obligations both to be impartial and to so appear.

With that background, the Auditor and the Executive Director of the VEPC sought legal advice from the AG, pursuant to 3 V.S.A. § 159. They posed 3 questions to the AG in a joint missive:

> 1. Do bond premiums fall under the definition of financing in 24 V.S.A. § 1891(7)?
>
> 2. Are municipalities required to obtain authorization from VEPC and municipal voters for the aggregate bond proceeds (principal and premium] which will be used to pay for public infrastructure improvements of a tax increment financing (TIF) district?
>
> 3. If statute and the Adopted TIF Rule are not conclusive on question 1 and 2, does VEPC have authority under 32 V.S.A. § 5404a(j)(1) to address these issues within the TIF Rules?[5]

---

[5] The parties have made clear that the third question is not at issue in this case, and the Auditor's sole focus is the alleged failure of the AG to provide answers regarding the first two questions.

The proper characterization of what ensued is the subject of serious debate. In Plaintiffs' view, the AG refused to give him the "yes" or "no" answers he sought as to Questions 1 and 2. In fact, they argue, the AG expressly refused to provide any legal opinions whatsoever as to Questions 1 and 2. The AG sees things quite differently. She maintains that legal advice was provided, Plaintiffs simply did not like it; and they are improperly attempting to get the Court to direct the AG on the types and forms of legal advice it is to render to another government official.

III. Analysis

The Court's consideration of these substantial matters is influenced heavily by a number of factors: principally, its interpretation of 3 V.S.A. § 159; the particular legal setting in which this matter has arisen; its view of the proper nature and scope of *mandamus* review; its sensitivity to the appropriate separation of powers between the judicial and executive branches, of which both the AG and the Auditor are parts; and its respect for recent Supreme Court precedent.[6]

A. Mootness

Before embarking on any analysis of the merits of the dispute, the Court must first address the AG's contention that this matter should be dismissed at the threshold based on the doctrine of mootness. "A case becomes moot—and this Court loses jurisdiction— when there no longer is an actual controversy or the litigants no longer have a legally cognizable interest in the outcome of the case." *Paige v. State*, 2017 VT 54, ¶ 7, 205 Vt. 287, 291. The AG argues that the case is moot because the legal issues related to bond

_____

[6] For purposes of the statutory/*mandamus* analysis, which resolves the present dispute, the Court assumes, *arguendo*, that the Auditor has standing to enforce §159.

premium were relevant to an audit that the Auditor has already completed. The Auditor issued the audit report for Burlington's Downtown TIF District on January 12, 2024. The Report is highly critical of Burlington's generation and use of premium, and it includes recommendations to the VEPC to: "Amend the TIF Rule to explicitly require disclosure of bond premiums and associated increased debt service in both District Finance Plans and public informational notices." *See* Report at 33.[7]

The Auditor's response to the mootness claim is that the Report is incomplete without the answers he seeks to Questions 1 and 2. He suggests that if he could get those "yes" or "no" answers, then he would amend the Report to incorporate that view of the issues. The Auditor also argues that these questions will persist in future audits. The status of bond premium as far as future TIF audits may go is uncertain, as the VEPC has apparently agreed to modify the TIF Rule to expressly account for bond premium. *See supra* n.7 below.

As between the competing characterizations of whether the Report is complete or not, however, the Court believes it must rely on the Auditor's representation that it remains to be completed when, or if, the Auditor acquires the legal answers he seeks via

---

[7] The report makes clear that Burlington vehemently disagreed with the Auditor's conclusions as to bond premium. The response from Burlington's Chief Administrative Officer to the draft Report, included in the appendix, states, in part: "[T]the draft Report is raising a new and untested concern that is disputed by the bond counsel for the transaction who opined both at the time of bonding and now that the City acted prudently, within its statutory authority and within well accepted industry practices." *See* Report at 40. The Report also includes a response from the VEPC, which includes this: "VEPC agrees to make the proposed amendments consistent with this recommendation [to amend the TIF Rule], subject to the rules relating to the ICAR and LCAR process." Report at 53. Whatever the VEPC may have done in that regard thereafter is not in the record of this case.

this action. It is solely the Auditor's prerogative to determine how to comply with his responsibility to conduct performance audits of TIF districts.[8]

This case is not moot.

## B. Opinions of the Attorney General and *Mandamus* Review

The parties parry and thrust using the terms "AG opinions" and "legal advice" often interchangeably. That may have led to some confusion during the underlying interchanges between the parties. For precision purposes, the AG rarely produces formal, published legal opinions, the most recent of which appears to be Formal Opinion #2014-1, dated May 13, 2014. *See* Formal Opinion #2014-1, available at https://ago.vermont.gov/sites/ago/files/wp-content/uploads/2018/03/Act-90-Opinion.pdf. Since 2000, there have only been 12 such formal opinions issued.

The AG also provides other opinions containing legal advice to State officers that are not published in the same manner as the formal opinions. They can come in all various shapes and sizes: emails, letters, or verbal communications. All such opinions "are, however, merely advisory opinions for the benefit of state officers." *Okemo Mountain, Inc. v. Town of Ludlow*, 171 Vt. 201, 206 (2000). The AG has no actual power to resolve any legal controversy simply by issuing an opinion, published or not. It is the Judiciary's ultimate duty to rule upon disputed legal issues.

The heart of the controversy in this case is 3 V.S.A. § 159, which provides in pertinent part: "The Attorney General shall advise the elective and appointive State officers on questions of law relating to their official duties and shall furnish a written

---

[8] At oral argument, the Auditor asserted that the Report says that it is not complete without the AG opinion. The Court has been unable to locate such an explicit caveat in the Report.

opinion on such matters, when so requested." There is no indication in this statute that the Legislature intended the references to legal advice ("shall advise") and legal opinions to refer to substantively different guidance in any manner that matters to this case. As Black's defines the terms, legal advice refers generally to the "guidance given by lawyers to their clients," whereas legal opinion refers to a "formal expression of . . . advice . . . prepared at a client's request." *See Black's Law Dictionary* (7th ed. 1999) at 55 (advice of counsel), 1120 (legal opinion). Section 159 requires the AG to provide advice to State officers on legal issues and, when requested, reduce that advice to a more formal writing addressing "such matters."

Otherwise, § 159 is more notable for what it does not say than what it does. It does not delegate unfettered discretion to the State officer seeking the advice to distill likely complex legal questions involving potentially competing policy, statutory or constitutional concerns into simple yes-or-no questions and to seek only binary responses to the inquiries. Nor does the statute include any enforcement mechanism or any standard by which one might qualitatively measure whether the AG's response to a request for an opinion is sufficient to comply with the statutory mandate.

Against that, Plaintiffs assert that the AG has *entirely* refused to provide any legal opinions as to the Auditor's Questions 1 and 2, and they seek relief in the nature of *mandamus* to compel her to do so. "A court can issue a writ of *mandamus . . .* only under certain circumstances: (1) the petitioner must have a clear and certain right to the action sought by the request for a writ; (2) the writ must be for the enforcement of ministerial duties, but not for review of the performance of official acts that involve the exercise of the official's judgment or discretion; and (3) there must be no other adequate remedy at

law." *Petition of Fairchild*, 159 Vt. 125, 130 (1992). Though limited, *mandamus* provides a potential avenue for relief in instances of so-called "extreme abuse[s] of discretion," truly arbitrary abuses of power. *See Vermont State Employees' Ass'n, Inc. v. Vt. Crim. Justice Training Council*, 167 Vt. 191, 195 (1997). The Vermont Supreme Court has made clear, however, that an extreme abuse of discretion must amount "to a practical refusal to perform a certain and clear legal duty." *Inman v. Pallito*, 2013 VT 94, ¶ 15, 195 Vt. 218, 224 (internal quotation omitted).

"Moreover, an application for [*mandamus*] is addressed to the sound judicial discretion of this court. It is not to be granted in all cases where a right in the applicant is made to appear. If circumstances are such as make it unwise or inexpedient to grant the writ, it will be refused." *Crystal Brook Farm v. Control Comm'rs of Derby*, 106 Vt. 8, 168 A. 912, 913 (1933) (citation omitted); *see also Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 390 (2004) (where separation of powers issues are present, they must be considered as part of the *mandamus* analysis).

Here, the Court perceives nothing ministerial about a lawyer's provision of a legal opinion to a client, a matter uniquely in the lawyer's judgment and discretion. Section 159 does not purport to regulate the substance, quality, or thoroughness of any advice or opinions produced pursuant to its authority. If there is any clear and certain right to anything ministerial in 3 V.S.A. § 159, it is that the AG, when requested by a State officer, must produce some kind of legal opinion addressing the "matter" raised by that State officer. The substance, quality, or breadth of any such opinion is not redressable under *mandamus* review.

Of equal import, respect for the separation of powers counsels in favor of wide-eyed caution in relation to the relief the Auditor seeks in this case. In that regard, the Arizona Court of Appeals decision in *Yes on Prop 200 v. Napolitano*, 160 P.3d 1216 (Ariz. Ct. App. 2007), is compelling. The Court adopts the relevant portion of that ruling for purposes of this case. In that case, the Arizona Attorney General had issued an opinion on request from a State officer as to the scope of a successful voter proposition. A group assembled to challenge, among other things, the substance of the Attorney General Opinion, claiming that it was legal error and, therefore, an abuse of discretion for purposes of *mandamus* review.

The *Yes on Prop 200* Court's reasoning has particular resonance here and the Court quotes it at length:

> The Plaintiffs' claim is that the Attorney General violated his duty by issuing a legally erroneous opinion.
>
> Plaintiffs acknowledge that the Attorney General has some discretion in formulating the opinions he issues to public officers. They further acknowledge that generally a *mandamus* action cannot be used to compel a government employee to perform a function in a particular way if the official is granted any discretion about how to perform it. When an official has discretion about how to perform a function, *mandamus* is available "to require him to act properly," only if the official abuses that discretion. Plaintiffs allege that the Attorney General abused his discretion in issuing an incorrect opinion.
>
> We have held that a court abuses its discretion when it commits a legal error in the process of exercising its discretion. Plaintiffs thus argue that they state a claim for *mandamus* against the Attorney General by alleging that he abused his discretion when he rendered [the opinion] because it is legally erroneous. We reject this argument.
>
> Although related, the responsibility to declare existing law and the responsibility to advise concerning it are separate and distinct. It is the responsibility of the courts to declare existing law. In contrast, it is the responsibility of the Attorney General to advise state government concerning the law when requested to do so. It is because the function of

courts is to declare existing law that they abuse their discretion when they make a legal error. Because the function of Attorneys General, however, is not to decide what the law is but merely opine about the law, the same principle does not necessarily apply.

If, as Plaintiffs suggest, a *mandamus* action could be brought to challenge the opinions of the Attorney General, upon such challenges, courts would effectively become direct legal advisors to the government. The courts would be compelled to decide previously unsettled legal questions as a necessary preliminary to determining whether the Attorney General's opinion on various matters were an abuse of discretion.

This would be an inappropriate usurpation by the courts of responsibility assigned to the Attorney General and, in our view, a violation of the separation of powers. Our system of government prohibits one branch of the government from exercising the powers granted to another branch of the government. We thus decline to determine on a writ of *mandamus* whether [the opinion] is a correct interpretation of the law.

Plaintiffs alternatively argue that [the opinion] constitutes an abuse of discretion because it is "contrary to reason, lacks a fair, solid and substantial basis and is not governed by any fixed rules or standards." They thus apparently argue that [the opinion] is so deficient that it amounts to a complete failure of the Attorney General to comply with the obligation to issue an opinion. Even assuming that a decision issued by the Attorney General could be so deficient as to be a complete failure to fulfill the statutory obligation to issue an opinion, our review indicates that, as a matter of law, such is not the case here. Thus, the Attorney General has complied with the duty imposed by statute, and no action for *mandamus* lies to perform a duty that has already been completed.

*Yes on Prop 200*, 160 P.3d at 1223–24 (citations and footnote omitted).

Given the above guidance and the language of § 159, the only even potential path to state a claim for *mandamus* relief in this case would be if the AG utterly failed to provide anything approximating a legal opinion in response to the Auditor's Questions 1 and 2.

### C. How the AG Responded to the Auditor

The subject matter of the questions presented to the AG by the Auditor was how Vermont statutes and VEPC's TIF rules apply to a municipality's responsibilities in

relation to bond premium and, if that is unclear, whether VEPC has the authority to clarify the matter in its TIF Rule.

In two letters dated November 1 and 21, 2023, the AG responded to the Auditor's request for an opinion regarding questions 1 and 2. The AG replied in substance, as summarized briefly by the Court, as follows. Relevant statutes related to TIF law delegate the power to develop policy and clarify the law to the VEPC and the Secretary of Commerce and Community Development, which may also involve the Commissioner of Taxes, the AG, and the State Treasurer.[9] How those issues are resolved can affect particular municipalities' interests and rights.

The VEPC also has relevant rulemaking power. 32 V.S.A. § 5404a(j)(1) ("The [VEPC] is hereby granted authority to adopt rules in accordance with 3 V.S.A. chapter 25 for the purpose of providing clarification and detail for administering the provisions of 24 V.S.A. chapter 53, subchapter 5 and the [TIF] district provisions of this section."). The Secretary of Commerce and Community Development has the power to resolve specific issues, as follows: "The Secretary of Commerce and Community Development, after reasonable notice to a municipality and an opportunity for a hearing, is authorized to issue decisions to a municipality on questions and inquiries concerning the administration of tax increment financing districts, statutes, rules, noncompliance with 24 V.S.A. chapter 53, subchapter 5, and any instances of noncompliance identified in

---

[9] It is arguably possible to construe the cited TIF statutes as more specifically addressing the subject matter of this case and, thus, controlling over § 159. *See Town of Brattleboro v. Garfield*, 2006 VT 56, ¶ 10, 180 Vt. 90, 94 ("[W]here two statutes deal with the same subject matter, and one is general and the other specific, the more specific statute controls."). Because the Court concludes that the AG has fulfilled her duty under § 159 in any event, there is no reason to engage in such an analysis.

audit reports conducted pursuant to subsection (l) of this section." 32 V.S.A. § 5404a(j)(2)(A). And the VEPC has authority to make recommendations to the Secretary in that regard after, if it wishes, consulting with the AG: "The [VEPC] shall prepare recommendations for the Secretary prior to the issuance of a decision. As appropriate, the Council may prepare such recommendations in consultation with the Commissioner of Taxes, the Attorney General, and the State Treasurer. In preparing recommendations, the [VEPC] shall provide a municipality with a reasonable opportunity to submit written information in support of its position. The Secretary shall review the recommendations of the Council and issue a final written decision on each matter within 60 days of the receipt of the recommendations." 32 V.S.A. § 5404a(j)(2)(B).

Additionally, in cases of alleged noncompliance, the Secretary can refer the matter to the AG for prosecution: "In lieu of or in addition to any action authorized in subdivision (3) of this subsection (j), the Secretary of Commerce and Community Development or the State Treasurer may refer the matter to the Office of the Attorney General with a recommendation that an appropriate civil action be initiated." 32 V.S.A. § 5404a(j)(4).

The AG's explication of the above authorities in her opinion letters is in keeping with the various statutes. As the AG's communications describe, the principal statutory method for clarifying the sort of issues presented by the Auditor's Questions 1 and 2 lies with the above processes involving the VEPC; the Secretary; and, sometimes, the relevant municipality. Injecting the AG into that procedure in a manner not contemplated by those statutes contravenes those legislatively crafted processes, as the AG explained at length in her letter of November 21, 2023.

In short, the Auditor's questions sought clarification of two issues related to TIF law, and the answer provided by the AG was a detailed explanation of and opinion regarding the legal processes by which such policy matters are rightly to be determined, including the advice that the VEPC is empowered to resolve those matters by rulemaking.[10]

To be sure, in both the letters of November 1 and November 21, the AG makes clear that she will not directly answer Questions 1 and 2 as framed by the Auditor, either by providing the yes-or-no answers desired or by making the policy determinations herself that are statutorily delegated to others. And some of the language used by the AG in the letters might support the Plaintiffs' views of her actions. The Court's job, however, is to determine the actual substance of the letters. The appropriate question for the limited *mandamus* review is not whether the AG scrupulously complied with the Auditor's framing of the legal issues; it is whether she met the mandate of § 159 to provide *some* legal opinion in relation to the matter presented. The Court concludes that she did.

Further, despite his protestations to the contrary, the Auditor certainly could have sought additional legal advice from non-AG attorneys or pursued the statutory pathways described above and in the AG opinion to seek clarification of the relevant issues.[11]

---

[10] As noted earlier, the Auditor included in its Report the recommendation that the VEPC amend its TIF Rule to clarify the relevant issues, and the VEPC agreed to do exactly that. *See supra* n.7 at 7.

[11] The Auditor uses auditing standards referred to as GAGAS (generally accepted government auditing standards) compiled by the U.S. Governmental Accountability Office in a publication called the Yellow Book. The Auditor argued here that the ethical rules for governmental audits somehow require that he obtain an AG opinion as to questions 1 and 2. The Court has found no such express provision. That source only

In any event, even if the Court determined that the AG's responses did not amount to a legal opinion, a conclusion it substantively rejects, the Court still would have grave separation-of-powers concerns over exercising its discretion to intervene through its *mandamus* authority in this internecine battle between executive officers. If the Court employed its judicial power to police the acceptable form and content of an AG opinion, that opinion might later be argued as the position of the State in an action before the same Court. It would then fall to the Court to determine what the actual law is on the subject, despite its prior involvement in forming the State's position. As the *Yes on Prop 200* Court counselled, Courts should be wary of treading into such areas that press (if not exceed) the outer bounds of acceptable separation-of-powers principles.

Accordingly, the claim for *mandamus* relief claim is dismissed under Vt. R. Civ. P. 12(b)(6).

### D. Declaratory Relief as to Section 159

If his arguments for a writ of *mandamus* have no traction, the Auditor urges the Court to issue declaratory relief. Framing the matter as seeking declaratory relief changes nothing. "The Declaratory Judgment Act allows parties who have a dispute within a court's jurisdiction to petition that court for declaratory relief at an early stage of the proceedings; however, the Act does not increase or enlarge the jurisdiction of the court over any subject matter or parties." *Vermont State Employees' Ass'n, Inc. v. Vermont Crim. Just. Training Council*, 167 Vt. 191, 194 (1997); *see also Anderson v.*

---

notes that an auditor may need to obtain legal advice to do her job and that she should attempt to get independent and objective advice. While the AG may be one possible avenue for such guidance, nothing in the GAGAS precludes an auditor from hiring, in good faith, outside counsel to get legal advice. Many states may well not even have a statutory equivalent of § 159.

*State*, 168 Vt. 641, 643 (1998) ("The purpose of a declaratory judgment is to provide a declaration of rights, status, and other legal relations of parties to an actual or justiciable controversy.").

Here, the Court has concluded that, to the extent actionable at all, the AG has issued a legal opinion as that term is broadly contemplated by § 159. The DJA provides no basis upon which to expound upon that determination.

This claim also is dismissed under Vt. R. Civ. P. 12(b)(6).

### E. The Constitutional Question

The Auditor next urges the Court to analyze whether it has the constitutional power to bring this action against the AG to enforce its duties under § 159 and the authority to compel the AG to authorize it to hire outside counsel to sue the AG. The AG asserts that the Auditor lacks such authority.

In the present action, the Auditor has hired outside counsel, and the AG has not attempted to "take over" the representation of the Auditor and dismiss the action voluntarily on that basis under Vt. R. Civ. P. 41. *See* 3 V.S.A. § 159 (AG "shall have general supervision of matters and actions in favor of the State and of those instituted by or against State officers wherein interests of the State are involved and may settle such matters and actions as the interests of the State require."). Given that, the Court does not believe the constitutional issues raised by the Auditor continue to present a live controversy. *See Holton v. Dep't of Emp. & Training (Town of Vernon)*, 2005 VT 42, ¶ 14, 178 Vt. 147, 153 (2005) ("The mootness doctrine derives its force from the Vermont Constitution, which, like its federal counterpart, limits the authority of the courts to the determination of actual, live controversies between adverse litigants."). Addressing such

matters, in the context of the procedural and factual circumstances presented here, would amount to the issuance of an advisory opinion. *See In re Opinion of the Justs.*, 115 Vt. 524, 529 (1949) ("Organically, courts are not instituted to render advisory opinions.").

Nor does the Court believe these questions are capable of repetition yet evading review. *See In re Blue Cross*, 2022 VT 53, ¶ 9, 217 Vt. 285, 289 (exception to mootness exists where there is "a reasonable expectation that the same complaining party will be subjected to the same action again" without the ability to obtain review). The Court's narrow view as to its ability to enforce the provisions of § 159 makes it highly unlikely that a scenario such as the present one would appear in the future. Moreover, if it did, the Court sees no reason that it would evade prompt and more appropriate review in the context of such concrete future facts.

Of equal weight, numerous precedents establish that courts should not wade into untested constitutional waters absent a clear need to do so. *See, e.g., State v. Bauder*, 2007 VT 16, ¶ 27, 181 Vt. 392, 404. As the *Bauder* Court opined: "It is, of course, a fundamental tenet of judicial restraint that courts will not address constitutional claims—least of all novel or unresolved constitutional claims—when adequate lesser grounds are available." *Id.*

Accordingly, the Court concludes there is no live controversy regarding the constitutional issues, and those claims are dismissed for want of jurisdiction. Vt. R. Civ. P. 12(b)(1).

The Court notes, however, that, were it to reach the question, it would not be free to draw on a blank slate as to the powers of the Auditor. The Vermont Supreme Court

has only recently addressed the issue and has been clear that the Auditor possesses *only* that authority that the Legislature has given him:

> The Vermont Constitution provides for the election of an Auditor of Accounts, *see* Vt. Const. ch. II, §§ 43, 48, but does not vest that position with any specific powers. The scope of the Auditor's authority is instead defined by the Legislature. *State v. Howard*, 83 Vt. 6, 17 ("[T]he powers of an auditor are determined by statutory provisions, and the State will not be bound if he exceeds the powers conferred."). Like other executive officials and agencies, the Auditor "possesses only that authority which the Legislature has granted." *In re Mathez Act 250 LU Permit*, 2018 VT 55, ¶ 13, 207 Vt. 537; *see also In re Hinsdale Farm*, 2004 VT 72, ¶ 10, 177 Vt. 115 ("The Legislature has made it clear that administrative departments may exercise only those powers expressly conferred, and that authority cannot arise through implication." (quotation omitted)).

*Vermont State Auditor v. OneCare Accountable Care Org., LLC*, 2022 VT 29, ¶ 18, 216 Vt. 478, 487.

While the Legislature has granted some agencies the independent authority to bring court actions without AG involvement–*see, e.g.*, 3 V.S.A. § 127(b) (Office of Professional Regulation may be bring suit against a person practicing a profession without authority); 9 V.S.A. § 4554(e) (empowering the Human Rights Commission to file suit in superior court)–it is undisputed that there is no statute expressly affording the Auditor such power.

The Court appreciates the Auditor's contentions that *OneCare* was wrongly decided on that point, that another portion of the Constitution might support his position,[12] that some 19th and early 20th Century Supreme Court rulings suggest that the Auditor can bring court actions, and that such power should be implied from the

---

[12] The Auditor cites Vt. Const. ch. II, § 26: "The Treasurer's accounts shall be annually audited, and a fair state thereof laid before the General Assembly." While *OneCare* did not mention that provision specifically, that section is not clear on its face that the audit it contemplates must be conducted by the Auditor, at least as a constitutional imperative.

Auditor's constitutional role and function. Those arguments enjoy not insignificant weight.

But the Supreme Court has spoken both plainly and recently; and the Court would not lightly infer that the High Court failed to consider the full Constitution and prior authorities in making its pronouncements. Accordingly, "[u]ntil a [higher] court . . . revokes a binding precedent, a [lower] court . . . is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority." *Eulitt ex rel. Eulitt v. Maine, Dept. of Educ.*, 386 F.3d 344, 349 (1st Cir. 2004), *abrogation on other grounds recognized by Carson as next friend of O. C. v. Makin*, 596 U.S. 767 (2022); *see also Nationstar Mortg. LLC v. Saticoy Bay LLC, Series 9229 Millikan Ave.*, 996 F.3d 950, 957 n.3 (9th Cir. 2021) ("The fact that a binding precedent failed to take some important authority into account may be a valid reason to ask that the case be reconsidered [by the court that issued the decision]; it is not a valid reason to ask [a lower court] to ignore the case.").

If it were to reach the question, *OneCare* remains an immoveable impediment to the Auditor's position before this Court.

F.    Citizen Hoffer's Standing in this Case

Finally, the AG argues that Citizen Hoffer has no standing in this case. Constitutional standing requires that a plaintiff in a suit against the government "must have suffered a particular injury that is attributable to the defendant and that can be redressed by a court of law." *Parker v. Town of Milton*, 169 Vt. 74, 77 (1998). "The standing doctrine protects the separation of powers between the branches of government by ensuring that courts confine themselves to deciding actual disputes and avoid

intervening in broader policy decisions that are reserved for" the other branches. *Paige v. State*, 2018 VT 136, ¶ 8, 209 Vt. 379, 384. "Standing . . . focuses directly on the question whether a particular interest or injury is adequate to invoke the protection of judicial decision." 13B Charles Wright, *et al., Federal Practice & Procedure: Juris.* 3d § 3531.12.

As to injury, the Court understands Citizen Hoffer to claim that he has suffered a reputational injury, that he is suffering an informational injury, and that he may suffer diminished electoral prospects in the future, all of which the Court can resolve by issuing the relief requested in this case. The Court disagrees.

Any reputational injury that Citizen Hoffer may have suffered occurred when the former mayor of Burlington reacted to the Auditor's criticism of its operation of the TIF district by publicly criticizing the Auditor. The Burlington mayor's criticism of the Auditor cannot be fairly attributed to the AG.

It is wholly unclear how anything the AG has done has anything to do with Citizen Hoffer's future electoral prospects. To the extent that Citizen Hoffer Auditor believes the positions he has taken on bond premium as Auditor diminish his electoral prospects, that is not something that can be attributed to the AG. If he means that the failure of the AG to resolve (at least from the current Auditor's perspective) the issue of bond premium somehow injures him, the injury is purely speculative.[13] The substance of her guidance cannot be controlled here; whatever it might have been if she had handled the Auditor's questions differently cannot be known.

---

[13] While of no import to the Court's ruling, the Court notes that, on November 5, 2024, Citizen Hoffer was elected to a 6th term as Auditor with roughly 60% of the vote.

The purported informational injury, presumably, is the lack of knowing the AG's more detailed views as to questions 1 and 2, assuming she has them. "Injury in fact is defined as the 'invasion of a legally protected interest.' Determining whether plaintiff has suffered an invasion of a legally protected interest requires inquiry into the substance of plaintiff's claim." *Hinesburg Sand & Gravel Co. v. State*, 166 Vt. 337, 341 (1997). "[A] constitutionally cognizable informational injury requires that a person lack access to information to which he is legally entitled *and* that the denial of that information creates a 'real' harm with an adverse effect." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017).

In this regard, Citizen Hoffer's claim can be based only on 3 V.S.A. § 159, which addresses a matter uniquely between the AG and State officers—and no one else. Stated another way, Citizen Hoffer, *qua* citizen, has no greater claim than any other citizen to the information in dispute. Given that, as to Citizen Hoffer, any noncompliance with § 159 by the AG is, at best, no more than the sort of "generalized grievance" that does not establish standing.[14] *See Brod v. Agency of Nat. Res.*, 2007 VT 87, ¶ 9, 182 Vt. 234, 239. In his personal capacity, Citizen Hoffer simply has no right to any opinion from the AG.

Citizen Hoffer lacks standing, and his claim is dismissed for lack of subject matter jurisdiction. Vt. R. Civ. P. 12(b)(1).

---

[14] In light of the generalized nature of the alleged harm and the lack of standing, the Court need not consider whether an AG opinion provided to an official is a record that is available to the public or is potentially exempt from such release due to attorney-client privilege. 1 V.S.A. 317(c)(1); *see 232511 Invs., Ltd. v. Town of Stowe Dev. Rev. Bd.*, 2005 VT 59, ¶ 2, 178 Vt. 590, 590 (legal opinion provided to municipal entity may not be a public record).

## Conclusion

For the foregoing reasons, the AG's motion to dismiss is granted.

Electronically Signed on November 20, 2024, per V.R.E.F. 9(d)

Timothy B. Tomasi
Superior Court Judge

24-CV-01621 Vermont Office of the Auditor of Accounts et al v. Vermont Office of the Attorney General et al